Alok Ahuja, Judge
The survivors of Joyce Oyler (collectively the "Oylers") brought a wrongful death petition against Hy-Vee, Inc. in the Circuit Court of Buchanan County. The petition alleged that the Hy-Vee pharmacy in St. Joseph negligently filled a prescription for Ms. Oyler with the wrong medication, causing her death. In addition to seeking compensatory damages, the Oylers' petition also sought additional damages for aggravating circumstances. During the trial of the Oylers' claims, the circuit court granted Hy-Vee's motion for a directed verdict on the issue of aggravating circumstances damages, and refused to submit the issue to the jury. The jury returned a verdict in favor of the Oylers on their claim for compensatory damages.
The Oylers appeal. They argue that the circuit court erroneously granted Hy-Vee a directed verdict concerning the availability of aggravating circumstances damages. We agree. We reverse the judgment of the circuit court, and remand the case for further proceedings on the Oylers' claim for aggravating circumstances damages.
Factual Background
On October 4, 2013, Joyce Oyler was hospitalized at the Heartland Regional Medical Center in St. Joseph as a result of fluid buildup in her lungs. When Ms. Oyler was released from the hospital on October 9, Nurse Caitlin Erdman phoned in a prescription order for multiple medications to the Hy-Vee pharmacy in St. Joseph. The order included a prescription for a daily diuretic, metolazone.
Hy-Vee pharmacy technician Nina Pecora took the phone-in prescription order for Ms. Oyler. Pecora had no formal pharmacy *744 training or education before becoming a pharmacy technician. She had worked in the Hy-Vee floral department before moving to the pharmacy.
Pecora made numerous errors transcribing Ms. Oyler's prescriptions. She made spelling errors on several of the medication orders, misspelled Nurse Erdman's name, and recorded an incorrect birth date for Ms. Oyler. Pecora also made a mistake on the dosage for an albuterol inhaler prescribed to Ms. Oyler. The dosage Pecora listed was ten times the correct dosage, and potentially could have caused heart arrhythmias and palpitations along with other complications.
Most significantly, Pecora recorded an order for a daily dose of methotrexate, rather than the metolazone which Ms. Oyler had been prescribed. Methotrexate is primarily used as an anti-cancer chemotherapy drug, as well as to treat certain auto-immune disorders including rheumatoid arthritis. When taken on a daily basis for more than a week, the drug can have irreversible and lethal side effects; symptoms do not manifest until the damage is untreatable. Methotrexate is one of a small number of drugs that is classified as a "high alert" medication by the Institute for Safe Medication Practices ("ISMP"). This classification is reserved for drugs which have potentially severe consequences if misused, and which should be handled with special care by pharmacies.
The Oylers' retained pharmacy expert, Dr. William Fassett, testified that technicians at the Hy-Vee pharmacy would "look in the computer to find drugs" when taking phone orders, "if they didn't know what the drugs were." Dr. Fassett testified that the computer system would provide the technician with a "drop-down menu" listing various drugs, based on the technician typing the first few letters of the drug's name. Dr. Fassett testified that, "if a person was looking for something that started with the three letters M-e-t and had a 2 ½ milligram strength, it's a very common mistake to pick the first one that meets those two criteria and pick the Methotrexate," rather than metolazone.
Hy-Vee pharmacist Kyle Long approved the methotrexate prescription for Ms. Oyler. Long testified that methotrexate can be safely administered at a once-weekly, or potentially twice-weekly, dosage. He acknowledged, however, that a daily dosage of methotrexate can be deadly. Long testified that he reviewed Ms. Oyler's prescription before it was filled; he testified, however, that "for some reason [I] didn't recognize the weekly versus the daily. It didn't click in my mind."
Hy-Vee utilized an automated system for filling prescriptions called EnterpriseRx. Long said that the program included a safeguard designed to alert pharmacists to dangerously high dosages of drugs like methotrexate. Long testified, however, that the system did not flag Ms. Oyler's methotrexate prescription, because the total number of methotrexate tablets prescribed to Ms. Oyler, if taken on a weekly basis, "would not be a high dose."
Dr. Fassett testified at trial that Hy-Vee lacked a sufficient safety system for "high alert" medications like methotrexate. Dr. Fassett testified that the ISMP has developed reasonable solutions to prevent prescription medication errors, which are "readily implemented" and widely relied on by prudent pharmacies. Dr. Fassett also testified that "[i]t has been known since at least 2002 ... that the way to prevent Mrs. Oyler from ever getting Methotrexate with a label saying 'Take one tablet daily' is to put a hard stop in the computer that prevents anybody from using it to print a label for methotrexate that says 'Take one tablet daily.' " Dr. Fassett testified that such a programmed "hard *745 stop" was "done widely around the country," and that the ISMP had published research indicating that such a "hard stop" would be 100% effective in preventing medication errors like the one which occurred here.
On October 9, after Ms. Oyler's prescriptions had been filled, her husband picked up the prescriptions at the pharmacy. The employee at the counter asked Mr. Oyler if he had any questions about Ms. Oyler's medications. When he responded that he did not, the Hy-Vee pharmacy employee provided no further counseling or warning about any of the medications. Hy-Vee's Pharmacy Quality Commitment Manual ("PQC Manual") "strongly recommend[s]" that all patients with new prescriptions receive patient counseling, even if not required by the laws of the state in which the pharmacy operates. Dr. Fassett testified that such counseling should be provided, at the least, when it comes to "high alert" drugs like methotrexate.
Ms. Oyler took the methotrexate daily as instructed by the label, and died less than a month later on October 30, 2013, as a result of side effects of the medication.
Ms. Oyler's husband and two adult sons filed a wrongful death petition in the Circuit Court of Buchanan County, naming Hy-Vee and Heartland Regional Medical Center as defendants. The petition included a claim for additional damages due to aggravating circumstances.
Heartland was dismissed from the lawsuit as the result of a settlement. The case proceeded to a jury trial solely against Hy-Vee. Prior to trial, Hy-Vee moved for partial summary judgment on the issue of aggravating circumstances damages, which was denied. Hy-Vee's motion for directed verdict concerning aggravating circumstances damages at the close of plaintiff's evidence was also denied. When Hy-Vee renewed the motion at the close of all of the evidence, however, the circuit court granted the motion, and the issue of aggravating circumstances was not submitted to the jury.
Hy-Vee admitted negligence at trial. The jury returned a verdict in the Oylers' favor for $2 million. The trial court reduced the award to $125,000 as a result of the damages caps contained in § 538.210.2, RSMo 2016, and based on the Oylers' prior settlement with Heartland.
Following the denial of their post-judgment motions, the Oylers filed this appeal.
Standard of Review
A circuit court's decision to grant a directed verdict is reviewed de novo. D.R. Sherry Const., Ltd. v. Am. Family Mut. Ins. Co. , 316 S.W.3d 899, 904 (Mo. banc 2010). The evidence is viewed in the light most favorable to the non-moving party, and that party is given the benefit of all reasonable inferences. Dodson v. Ferrara , 491 S.W.3d 542, 551 (Mo. banc 2016). "If the facts are such that reasonable minds could draw differing conclusions, the issue becomes a question for the jury, and a directed verdict is improper." Id. at 552.
Discussion
The Oylers argue that they presented sufficient evidence to support a jury award of damages for aggravating circumstances, and that the circuit court was therefore mistaken in directing a verdict against them on this issue.[1]
*746 "To support a claim for aggravating circumstances damages or for punitive damages, the plaintiff must present clear and convincing evidence at trial to support the claim." Dodson , 491 S.W.3d at 562-63.[2]
[A]ggravating circumstances are not generally recoverable in negligence actions because "negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." Nonetheless, both Missouri Approved Instruction (MAI) 10.02 and MAI 10.07 provide that punitive damages may be awarded for a negligent act or omission if the jury finds that the conduct of the defendant "showed complete indifference to or conscious disregard for the safety of others." MAI 6.02 states that the same showing is necessary for an award of aggravating circumstances damages in a wrongful death case when the theory of liability is negligence.
Dodson , 491 S.W.3d at 563 (other citation omitted).
" 'In a negligence action, punitive damages may be awarded if the defendant knew or had reason to know a high degree of probability existed that the action would result in injury.' " Poage v. Crane Co. , 523 S.W.3d 496, 515 (Mo. App. E.D. 2017) (quoting Letz v. Turbomeca Engine Corp. , 975 S.W.2d 155, 164 (Mo. App. W.D. 1997) (en banc)).
[A]n act or omission that is properly characterized as negligent "may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted." In this context, " 'reckless' connotes an indifference to whether or not wrong or injury is done." Additionally, a negligent act may equate to the "conscious disregard for the safety of others" if the defendant is conscious of his conduct and has knowledge that his conduct will naturally and probably result in injury, even if he lacks a specific intent to cause the injury.
Poage , 523 S.W.3d at 516 (citations omitted); see also Blanks v. Fluor Corp. , 450 S.W.3d 308, 401 (Mo. App. E.D. 2014) ; Smith v. Brown & Williamson Tobacco Corp. , 275 S.W.3d 748, 812-13 (Mo. App. W.D. 2008) ; Coon v. Am. Compressed Steel, Inc. , 207 S.W.3d 629, 637 (Mo. App. W.D. 2006).
Viewed in the light most favorable to the Oylers, the evidence in this case was sufficient to permit the jury to conclude that Hy-Vee acted with complete indifference to, and conscious disregard for, the safety of others, in circumstances which presented a high probability of injury. We reach this conclusion based on multiple considerations.
1. The jury could have concluded that aggravating circumstances damages were warranted based on pharmacist Kyle Long's failure to review Ms. Oyler's methotrexate prescription before it was dispensed to her. Hy-Vee's practice was that pharmacists reviewed new prescription orders twice: first, in "a step called pre-verification," which occurs "before any pills are even put into a bottle"; and later, in a "final verification," after a prescription bottle has been filled. Long approved Ms. Oyler's methotrexate prescription. He testified *747 that Hy-Vee had higher requirements for new prescriptions versus prescription refills. Long also testified that it would be "dangerous" for a pharmacist to skip the pre-verification step; "[i]t's in place for a reason." He testified that there was certain information, and certain errors, that only a pharmacist might appreciate. Long testified that it would never be appropriate for a pharmacist not to engage in the pre-verification step; "we would want to look at every new prescription that came through."
Similarly, Hy-Vee's corporate representative, St. Joseph pharmacy manager Cynthia Roades, testified that although Hy-Vee uses computer databases to check prescriptions for potentially dangerous conditions like drug interactions and allergies, a pharmacist must independently use his or her professional judgment to ensure the prescriptions are safe. When asked whether methotrexate deserved special treatment in the pharmacy due to the risks it presented, Roades testified that virtually all of the medications dispensed by the Hy-Vee pharmacy had the potential to be dangerous to particular patients, and should be dispensed with care and attention. The jury could conclude that pharmacist review was particularly important because Hy-Vee's computer system did not have the "hard stop" feature Dr. Fassett described, which would have prevented a prescription label being printed for a daily dose of methotrexate.
Long testified at trial that he had, in fact, reviewed Ms. Oyler's prescriptions before the methotrexate was dispensed to her, although he claimed that "for some reason [I] didn't recognize the weekly versus the daily [dosage]. It didn't click in my mind." Hy-Vee's corporate representative Roades testified in her deposition, however, that based on her review, "the pharmacist really did not perform a medication review of this drug and of this patient on October 9th." Roades testified that, if a review had been conducted, "the pharmacist should have known that this Methotrexate should not have been given to this patient, or at a minimum the doctor should have been called, or somebody should have spoken with Mr. Oyler and Mrs. Oyler." Roades testified that the failure of a Hy-Vee pharmacist to review Ms. Oyler's prescriptions "was a breakdown in the system." The Oylers' expert witness, Dr. Fassett, similarly testified that "insufficient time was spent on the prescription" to properly evaluate it.
The evidence indicated that the error in the prescription for methotrexate would have been obvious to a pharmacist (assuming they reviewed the prescription before it was dispensed). Long agreed that the prescription order Pecora recorded for methotrexate was "a deadly dosage for that medicine." He testified that, if the erroneous, deadly dosage for methotrexate"would have clicked in my mind," "[t]he dosing on the Methotrexate would have prompted me to call the doctor, and that's where it would have ... started and ended." Long testified that he would have known to contact Ms. Oyler's physician to verify the order, without the need to review any other resource materials maintained by the pharmacy.
The evidence described above would have permitted the jury to find that pharmacist review of new prescriptions was required by Hy-Vee's policies, and that Long knew it was dangerous to fill and dispense prescriptions, particularly prescriptions for "high alert" medications like methotrexate, without having a pharmacist conduct a meaningful review. The jury could also have found that the fatal dosing error in the methotrexate prescription would have been readily discoverable if Long had conducted a meaningful review.
*748 Despite his knowledge of the potentially fatal consequences of failing to review new prescriptions for "high alert" medications, however, the jury could have found that Long failed to conduct any meaningful review of Ms. Oyler's prescriptions. The jury could have concluded that, when he failed to perform a meaningful review of Ms. Oyler's prescriptions Long knew, or should have known, that his actions created a high probability of injury, justifying a finding of aggravating circumstances.
2. The significance of Long's failure to conduct a meaningful, independent review of Ms. Oyler's prescriptions is heightened by the fact that the prescription order was initially received by Pecora, a pharmacy technician, and not by a pharmacist. Some of the evidence before the jury stated that it is inappropriate for pharmacy technicians to receive telephone orders for new prescriptions. The St. Joseph pharmacy's "Policy and Procedures" states that it uses the Pharmacy Quality Commitment or "PQC" manual "as an ongoing systematic program of standards and procedures to detect, identify, evaluate and prevent medication errors, thereby improving medication therapy and quality of patient care." The PQC manual recommends that "pharmacists take all new prescriptions that are phoned in from prescribers' offices." Similarly, the National Pharmacy Technician Training Program materials used by the St. Joseph pharmacy contain the following admonition:
Duties Pharmacy Technicians Cannot Perform
Certain duties cannot be assigned to you because they can only be performed by pharmacists. These restrictions are regulated at state and federal levels and you must follow them closely.
• Only pharmacists can receive oral prescriptions from prescribers or prescribers' authorized designees. (This refers primarily to new telephone prescriptions and refill authorizations where there are changes to the prescriptions.)
Despite the recommendation in the PQC Manual, and the prohibition in the training materials, Long testified that pharmacy technicians were permitted to take phone orders for new prescriptions at the St. Joseph pharmacy. Hy-Vee's corporate representative testified that, if the recommendation in the PQC Manual that only pharmacists take phone orders had been followed, it "might have served to save Mrs. Oyler's life."
Even if pharmacy technicians were not prohibited from taking telephone orders for new prescriptions, the evidence indicated that technicians should only take telephone orders under the direct supervision of a pharmacist. The Oylers' expert, Dr. William Fassett, acknowledged that Missouri was one of a minority of states which permit pharmacy technicians to take telephone orders. Dr. Fassett emphasized, however, that Missouri law only permitted pharmacy technicians to take telephone orders "under very specific circumstances and with the expectation of a high level of supervision and training of the technician by the pharmacist."[3] Similarly, the Missouri Pharmacy Practice Guide prepared by the Board of Pharmacy states that "[t]elephone information may be received by a pharmacist or by a technician/intern pharmacist acting under the pharmacists' direct supervision." See also 20 C.S.R. 2220-2.700 (specifying generally that pharmacy technicians "assume[ ] a supportive *749 role under the direct supervision and responsibility of a pharmacist").
The evidence we have described above would have permitted the jury to find that Pecora's receipt of new prescriptions by telephone was not subjected to the "high level of supervision" required by Missouri law and the standard of care. Moreover, the evidence concerning Pecora's lack of pre-employment education and training,[4] and of the number of errors she made in transcribing Ms. Oyler's prescriptions, would have permitted the jury to conclude that Hy-Vee's pharmacists should have been aware of a substantial risk of errors if Pecora's work was not subject to meaningful pharmacist review.
3. The fact that Hy-Vee failed to have a pharmacist personally counsel Mr. Oyler when he picked up Ms. Oyler's prescription for this "high alert" medication would also support a finding of aggravating circumstances. Rather than providing pharmacist counseling, Hy-Vee personnel merely asked Mr. Oyler whether he had any questions.
The PQC Manual employed by Hy-Vee states:
The laws of states vary; however, even if the law requires only an offer of counseling be made to patients, it is strongly recommended that all patients with new prescriptions or any changes in prescriptions receive patient counseling unless extraordinary circumstances prevent counseling .
(Emphasis added.) Long testified that this "strong recommend[ation]" in the PQC Manual was not followed; instead, patients were offered counseling by being asked, "Do you have any questions for the pharmacist?"
Beyond the "strong recommend[ation]" in the PQC Manual, Hy-Vee's corporate representative testified that her personal practice was to always place a note with a prescription for methotrexate, requiring that a pharmacist have a direct consultation with the patient, "because [she] know[s] that Methotrexate is potentially dangerous on that issue" of daily versus weekly administration. Similarly, the Oylers' expert testified that "absolutely every single patient who is given a prescription for Methotrexate must absolutely be individually counseled by the pharmacist and told not to take it once daily." Dr. Fassett testified that simply asking the patient if they had any questions was insufficient; he testified that "[i]t's absolutely inadequate and it's absolutely deadly in the case of these high-alert drugs to not do that counseling."
Long testified that he knew how to require that a patient speak with a pharmacist before receiving a medication. He did not use that mechanism in this case, however.
Hy-Vee could have required that all pharmacists in the St. Joseph pharmacy follow the practice of the pharmacy's manager, and personally speak with patients before dispensing new prescriptions for high-risk medications like methotrexate. The jury could conclude that Hy-Vee's decision to leave the decision whether to counsel patients to the discretion of individual pharmacists exhibited conscious indifference to patient safety, when the consequences of prescription errors were potentially lethal.
*750 4. Finally, the evidence would have permitted the jury to conclude that Hy-Vee had made no meaningful changes to its procedures as a result of Ms. Oyler's death. Long testified that, following Ms. Oyler's death, he was unaware of any specific changes in the policies or procedures at the St. Joseph pharmacy. In particular, no changes had been made to the practice of permitting pharmacy technicians to take telephone orders for new prescriptions; patients were still merely offered counseling when they picked up new prescriptions despite the "strong recommendation" in the PQC Manual; and "high alert" medications like methotrexate were still not treated any differently than other drugs.
When she was asked whether Hy-Vee had instituted any changes as a result of Ms. Oyler's death, corporate representative Roades testified that the pharmacists as a group "have had indepth conversation about being more conscientious than we already were, you know, just trying to be more safe in everything that we do." Roades could not identify any specific change to the pharmacy's practices which had resulted from Ms. Oyler's death. In particular, Roades agreed that, "as long as the State of Missouri allows it, [Hy-Vee was] going to continue to let pharmacy techs, even the ones that might make multiple errors on prescription slips, continue to take new prescriptions over the phone." Although Roades acknowledged that Long's failure to review Ms. Oyler's prescriptions was "a breakdown in the system," she also testified that she was unaware of any way in which Hy-Vee could have prevented the outcome in this case.
Hy-Vee's failure to take any meaningful corrective action following Ms. Oyler's death supports the conclusion that its conduct exhibited complete indifference or a conscious disregard for Ms. Oyler's safety. "Evidence of other acts of defendant than those alleged for which damages are sought, both preceding as well as following the particular acts, is admissible under an issue of exemplary damages if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed." Charles F. Curry & Co. v. Hedrick , 378 S.W.2d 522, 536 (Mo. 1964).[5] The jury could find that a number of specific remedial measures would prevent a repetition of the events leading to Ms. Oyler's *751 death (for example, prohibiting pharmacy technicians from taking new telephone prescription orders; flagging orders for "high alert" medications for greater scrutiny; or requiring pharmacist counseling prior to dispensing new prescriptions for "high alert" medications). The jury would be entitled to conclude that Hy-Vee's claim that different practices would not have prevented Ms. Oyler's death, and its failure to institute the remedial measures suggested by the evidence, exhibited its indifference to, and disregard for, the serious risk of injury to patients like Ms. Oyler.
Conclusion
For the foregoing reasons, we conclude that the circuit court erred in directing a verdict for Hy-Vee on the Oylers' claim for aggravating circumstances damages. The circuit court's grant of a directed verdict is reversed, and the case is remanded for a new trial on the issue of aggravating circumstances.
All concur.

Hy-Vee has not appealed from the judgment, and neither party raises any issue on appeal concerning the compensatory damages awarded to the Oylers in the circuit court's judgment. Because the compensatory damage award is not challenged on appeal, our decision today has no effect on that award.

"Damages for aggravating circumstances in wrongful death cases are governed by the same standards as punitive damages." Martin v. Survivair Respirators, Inc. , 298 S.W.3d 23, 30 n.2 (Mo. App. E.D. 2009) (citing Call v. Heard , 925 S.W.2d 840, 849 (Mo. banc 1996) ); see also , e.g. , Barnett v. La Societe Anonyme Turbomeca France , 963 S.W.2d 639, 662 (Mo. App. W.D. 1997) (en banc) (citing Bennett v. Owens-Corning Fiberglas Corp. 896 S.W.2d 464, 466 (Mo. banc 1995) ). Barnett was overruled on other grounds by Badahman v. Catering St. Louis , 395 S.W.3d 29, 40 (Mo. banc 2013).

Although the Oylers now argue (citing § 338.095.2, RSMo ) that Missouri law prohibits pharmacy technicians from accepting telephone orders for new prescriptions, their own expert explicitly testified at trial that Missouri law permitted the practice.

Hy-Vee's corporate representative, pharmacy manager Cynthia Roades, testified that it was "a common situation" that Hy-Vee's pharmacy technicians had undergone no training, and received no education, in the pharmacy field prior to being hired to work as pharmacy technicians.

In Hedrick , the plaintiff contended that the defendant had converted an airplane. The Supreme Court held that "evidence that defendant let the plane sit outside for fifteen months or more without running its engines," causing damage, subsequent to the alleged conversion, was admissible on the issue of punitive damage. 378 S.W.2d at 536. See also, e.g., State ex rel. Ford Motor Co. v. Messina , 71 S.W.3d 602, 608 (Mo. banc 2002) ("Recalling (or failing to recall) a product[, even after events causing injury to the plaintiff,] may illumine defendant's disposition toward that product."); Boshears v. Saint-Gobain Calmar, Inc. , 272 S.W.3d 215, 225-26 (Mo. App. W.D. 2008) (circuit court did not abuse its discretion by permitting plaintiff's counsel to ask defense witnesses whether defendant had "learned its lesson" from the accident which caused plaintiff's injury); Cohen v. Express Fin. Servs., Inc. , 145 S.W.3d 857, 868-69 (Mo. App. W.D. 2004) (in assessing punitive damages, jury was entitled to consider the actions of the new sales manager for defendant car dealer following allegedly deceptive sale of vehicle to plaintiff); Benedict v. N. Pipeline Const. , 44 S.W.3d 410, 422 (Mo. App. W.D. 2001) (evidence of complaints made to defendant involving similar condition, after the plaintiff's injury, "were relevant to the issue of punitive damages to show that [the defendant] had a pattern of showing conscious disregard and reckless indifference to this type of problem"); Maugh v. Chrysler Corp. , 818 S.W.2d 658, 664 (Mo. App. W.D. 1991) (evidence of defendant's offer to replace defective vehicle two years after allegedly fraudulent sale was relevant to punitive damages issue).