

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| CARRIE S. SCHULTZ and ROBERT C. SCHULTZ, SR., surviving parents of ROBERT C. SCHULTZ, JR., deceased, | ) ) ) | No. ED111241 |
| | ) | Appeal from the Circuit Court |
| Respondents, | ) | of Saint Charles County |
| | ) | 2011-CC00821 |
| vs. | ) | |
| | ) | |
| GREAT PLAINS TRUCKING, INC. and LENNIS H. BECK, | ) ) | Honorable W. Christopher McDonough |
| | ) | |
| Appellants. | ) | Filed: March 26, 2024 |

Great Plains Trucking, Inc. (individually "Great Plains") and Lennis H. Beck (individually "Beck" or "Lennis Beck") (collectively "Defendants") appeal the judgment, entered after a jury trial, in favor of Carrie S. Schultz (individually "Mother") and Robert C. Schultz, Sr. (individually "Father") (collectively "Plaintiffs"), surviving parents of Robert C. Schultz, Jr. ("Decedent"), on Plaintiffs' wrongful death action. Plaintiffs' wrongful death action arose out of a vehicular crash between a Great Plains tractor-trailer truck driven by Beck and a car driven by Mother in which Decedent was a passenger. The trial court's judgment entered upon the jury's verdicts awarded Plaintiffs $10 million in compensatory damages against Defendants, $10 million in aggravating circumstances damages against Great Plains, $25,000 in aggravating circumstances damages against Beck, and post-judgment interest against Defendants. We affirm.

# I. BACKGROUND[1]

Great Plains employs about eighty truck drivers including Lennis Beck. Beck had a commercial driver's license ("CDL") from 2002 through the proceedings in this case.

At about midnight on August 6, 2019 – the date of the fatal vehicular accident in this case – Beck left a Great Plains facility in Salina, Kansas, drove a fully loaded 18-wheeler Great Plains tractor-trailer truck weighing 50,000 pounds, and headed for Jefferson, Georgia. Beck had made the same trip once a week for six months prior to August 2019.

Beck's driving on August 6, 2019, was recorded on a dash camera in the tractor-trailer truck, and the truck captured data including acceleration, cruise control engagement, braking, speed, and deceleration. The truck's dash camera footage and data were analyzed by experts for purposes of Plaintiffs' wrongful death action and jury trial.

## A. The Circumstances Leading Up to and Including the Fatal Accident

Beck arrived in Kansas City, Missouri, at 2:45 a.m. on August 6. It began raining, and the rain continued, sometimes in a downpour, sometimes in a drizzle, across Missouri on eastbound Highway 70 until Beck reached Warrenton, Missouri, between 5:29 and 5:36 a.m. Beck did not lessen his speed or remove the cruise control set at 70 miles per hour ("mph") as he drove through the rain from Kansas City. When Beck arrived in Warrenton, the rain continued, the road was wet, and the windshield wipers were still necessary.

As Beck entered Wentzville, Missouri, on eastbound Highway 70, he encountered light traffic in the dark and in the rain, and his windshield wipers were still necessary. Although the posted speed limit dropped to 65 mph, Beck did not slow the tractor-trailer truck down but instead continued driving with the cruise control set at 70 mph.

---

[1] "This Court reviews the evidence and reasonable inferences therefrom in a light most favorable to the jury's verdict[s]." *Denney v. Syberg's Westport, Inc.*, 665 S.W.3d 348, 353 n.1 (Mo. App. E.D. 2023).

About a mile before the exit from eastbound Highway 70 to Highway 64/40, Beck encountered slower traffic in the right lane, and he moved to the fast lane to avoid needing to slow down. Additionally, he did not disengage his cruise control set at 70 mph.

Beck then passed a flashing yellow light and sign notifying drivers there was a curve ahead which had a 60 mph advisory speed limit. Plaintiffs' trucking safety expert testified professional drivers of 18-wheelers with CDLs are supposed to "keep an eye out for [such] signs and be able to recognize them" and that advisory speed limits for curves are mandatory for such drivers.

Because of Beck's history of driving the same route for six months prior to the fatal accident in this case and because Beck had traveled through the curve approximately fifty times, Beck was aware of the curve and knew that if there was ever a problem on it, he could only avoid an accident by lessening his speed and the distance it would take him to come to a stop. Beck also knew he could not see around the curve at issue, and that he would be "driving [] blind" if he drove too fast to stop within the distance he could see ahead of him. Although Beck admitted these circumstances were reasons for a truck driver to slow down when driving into the curve, on the date of the accident in this case Beck did not slow down or drive the advisory speed limit of 60 mph into the curve. Instead, with the cruise control still set at 70 mph, Beck's tractor-trailer truck accelerated into the curve.

As Beck accelerated into the "blind" curve, Mother's car was just ahead of Beck. In light rain, Mother was driving herself and her nineteen-year-old son (Decedent) to McDonald's in Lake St. Louis, where they were scheduled to work together on the 6:00 a.m. shift. Mother was driving in the slower, right hand lane when another car to her left sped up and cut in front of her. The back of Mother's car then "fishtailed," i.e., slid back and forth from left to right, as she tried

3

to avoid the other car, and Mother's car hit the center median wall. Then, a pickup truck slightly hit Mother's car, resulting in Mother's vehicle coming to a rest on the highway.

In the meantime, Beck was driving his tractor-trailer truck into the curve in the left hand lane with his cruise control set at 70 mph behind Mother's car, and he passed braking vehicles in the right lane of the curve. Beck then saw Mother's car's flashing headlights around the curve, slammed on his brakes, and collided Defendants' 18-wheeler into Mother's car. Decedent subsequently died as a result of the accident.

**B.    A Summary of Additional Evidence Presented by Plaintiffs in Support of Compensatory and Aggravating Circumstances Damages**

At trial, Beck admitted he was required to comply with Missouri's CDL manual ("CDL manual" or "Missouri's CDL manual"). The CDL manual requires professional truck drivers to reduce their speed in four circumstances which were applicable to the road conditions at or near the time of the accident in this case: reduced traction, traffic, curves, and limited visibility.[2] As explained in detail in Section II.D. of this opinion, the evidence adduced at trial showed that Beck violated these four separate CDL manual requirements by failing to reduce his speed during the timeframe leading up to the accident.

Additionally, Plaintiffs' trucking safety expert testified at trial that based on the preserved data from Beck's tractor-trailer truck on the date of the accident, it was his opinion to a "reasonable degree of trucking safety certainty" that Beck failed to use the highest degree of care that a professional driver of an 18-wheeler would use under the same or similar circumstances. Plaintiffs' trucking safety expert also testified to a "reasonable degree of scientific certainty" that Beck's "incredible deviation from the standard of care" was a direct and contributing cause of the collision with Mother's vehicle.

---

[2] The CDL manual also requires professional truck drivers to reduce their speed in a fifth circumstance which was not applicable to the road conditions at the time of the accident in this case – when there are hills.

Plaintiffs also presented testimony from Beck whereby he admitted he did not comply with all of the requirements of Missouri's CDL manual during the timeframe leading up to the fatal accident even though: (1) he had been a CDL driver for seventeen years prior to the accident; (2) he knew an 18-wheeler, weighing 50,000 pounds, could do a lot more damage than a car traveling at the same speed; and (3) he knew someone could die if he did not follow the requirements of the CDL manual.

As to Great Plains, Plaintiff presented testimony that the company failed to take specific actions after the accident. Specifically, Great Plains did not review whether Beck had complied with the requirements of the CDL manual; Great Plains did not require Beck to have any additional training; and Great Plains did not tell Beck to lower his speed when driving on a curve or wet road in the future. Additionally, upon questioning by Plaintiffs' counsel at trial, Great Plains' safety director and Great Plains' president each admitted Beck did not comply with all of the requirements of the CDL manual during the timeframe leading up to the fatal accident. Nevertheless, Great Plains' safety director testified she believed Beck drove at a "safe" and "reasonable" speed during the timeframe leading up to the accident and that she would not (and did not) recommend Beck do anything differently than he did. Moreover, Great Plains' president testified: (1) "I'd probably have done the same thing [as Beck] if I was there [on the date of the accident in this case]"; and (2) there was an unwritten rule at Great Plains that drivers of 18-wheelers may exceed the speed limit by 4-5 mph "[i]n all circumstances," and "[e]ven in a fatal collision."

## C.     The Relevant Procedural Posture

After hearing the above evidence, the jury entered verdicts awarding Plaintiffs $10 million in compensatory damages against Defendants, $10 million in aggravating circumstances damages against Great Plains, and $25,000 in aggravating circumstances damages against Beck.

5

The trial court then entered a judgment awarding Plaintiffs damages in accordance with the jury's verdicts as well as post-judgment interest against Defendants.

Defendants subsequently filed post-trial motions requesting a new trial or judgment notwithstanding the verdict ("JNOV"). Defendants' motions specifically argued the trial court erred in: (1) excluding expert testimony from a doctor who opined Mother was impaired by THC at the time of the fatal accident and that Mother's impairment caused the accident; (2) failing to limit Plaintiffs (Decedent's Mother and Father), who had retained separate counsel and who were divorced, to participation by one attorney in various stages of the trial; (3) submitting Instruction No. 7, the proffered negligence verdict-directing instruction; and (4) submitting claims for aggravating circumstances damages against Defendant Beck and Defendant Great Plains. After the trial court denied Defendants' post-trial motions, this appeal followed.[3]

## II.    DISCUSSION

Defendants raise four points on appeal arguing the trial court's judgment entered in favor of Plaintiffs is erroneous. Defendants' first point on appeal asserts the trial court erred in excluding expert testimony from a doctor ("Doctor") who opined Mother was impaired by THC at the time of the fatal accident and that Mother's impairment caused the accident. Defendants' second point on appeal contends the trial court erred in failing to limit Plaintiffs (Decedent's Mother and Father), who had retained separate counsel and who were divorced, to participation by one attorney in various stages of the trial. Defendants' third point on appeal claims the trial court erred in submitting Instruction No. 7, the proffered negligence verdict-directing instruction. Finally, Defendants' fourth point on appeal argues the trial court erred in submitting claims for aggravating circumstances damages against Defendant Beck and Defendant Great Plains.

---

[3] To avoid unnecessary repetition, additional facts and procedural posture relevant to each of Defendants' points on appeal will be set forth in Sections II.A., II.B., II.C., and II.D. of this opinion.

6

**A.** **Whether the Trial Court Erred in Excluding Doctor's Expert Opinion Testimony Regarding Mother's Alleged THC Impairment and Causation**

In Defendants' first point on appeal, they assert the trial court erred in excluding Doctor's expert opinion testimony that Mother was impaired by THC at the time of the fatal accident and Mother's impairment led her to lose control of her car before Defendants' 18-wheeler collided with it. Defendants claim they were prejudiced by the exclusion of this evidence because Doctor's opinions "were critical to [] [D]efendants' defense that [Mother] was the sole cause of the accident." We hold the trial court did not err in excluding Doctor's opinion testimony pursuant to: the abuse-of-discretion standard of review; section 490.065[4] (the statute governing the admissibility of expert testimony); Missouri Supreme Court precedent; Missouri's current statutory scheme which does not provide for a set presumption of impairment for marijuana; existing Missouri case law; and the circumstances of this case.

**1.** **General Standard of Review, Relevant Law Regarding the Admissibility of Expert Testimony, and the Dispositive Issues in this Point on Appeal**

In this case, it is undisputed that the issue of whether the trial court erred in excluding Doctor's expert testimony was preserved for appeal. Under these circumstances, our Court's review of the trial court's decision is for an abuse of discretion. *Kirk v. State*, 520 S.W.3d 443, 454 (Mo. banc 2017); *see also Linton by and through Linton v. Carter*, 634 S.W.3d 623, 626-27 (Mo. banc 2021). "The [trial] court enjoys considerable discretion in the admission or exclusion of evidence." *Shallow v. Follwell*, 554 S.W.3d 878, 881 (Mo. banc 2018) (citation and internal quotations omitted).

A trial court abuses its discretion when its decision "is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Linton*, 634 S.W.3d at 627

---

[4] All references to section 490.065 are to RSMo Cum. Supp. 2018 (effective from August 28, 2017, to the present).

(citation omitted). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Id.* (citation omitted). Additionally, a trial court's judgment will only be reversed if an erroneous evidentiary ruling results in prejudice, which occurs when the error materially affected the merits of the action. *Id.*; *Estate of Andress*, 624 S.W.3d 894, 901 (Mo. App. E.D. 2021).

"Expert testimony in civil cases is only admissible if it satisfies the evidentiary requirements of section 490.065." *Huett v. Branson*, 675 S.W.3d 514, 520 (Mo. App. E.D. 2023) (citing *Linton*, 634 S.W.3d at 626). Our Court reviews the application of section 490.065 to the facts of a particular case for an abuse of discretion. *Huett*, 675 S.W.3d at 521 (citing *Kirk*, 520 S.W.3d at 460).

Section 490.065.2, which applies to this case involving a wrongful death action,[5] provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

---

[5] For civil actions, the evidentiary requirements of either section 490.065.1 or section 490.065.2 apply depending on the type of action at issue in a case. *See* section 490.065.1 and .2; *see also State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 315-16 (Mo. App. E.D. 2018). Subsection 2 of section 490.065 applies to this case involving a wrongful death action because such an action is not specified in subsection 1 of the statute. *See* section 490.065.2 (governing "all actions except those to which subsection 1 of [section 490.065] applies"); section 490.065.1 (explicitly governing: (1) "[domestic] actions brought under chapter 451, 452, 453, 454, or 455"; (2) "actions adjudicated in juvenile courts under chapter 211"; (3) "actions adjudicated . . . in family courts under chapter 487"; (4) "all proceedings before the probate division of the circuit court"; and (5) "all actions or proceedings in which there is no right to a jury trial"); *see generally* chapters 451-455; *see also Gardner*, 562 S.W.3d at 315-16.

Section 490.065.2(1).[6]  In sum, testimony is admissible under section 490.065.2 when it is proffered by a qualified expert, it is reliable, and it is relevant.  *Huett*, 675 S.W.3d at 521; *see also* section 490.065.2.  In this case, the trial court excluded Doctor's expert testimony on two grounds: (1) it was not reliable; and (2) it was not relevant.[7]

## 2. Relevant Facts and Procedural Posture

Doctor is a forensic pathologist and medical examiner who was retained as an expert by Defendants to opine Mother was impaired by THC at the time of the fatal accident and that her alleged impairment caused the accident.  Prior to trial, Plaintiffs filed a motion to exclude Doctor's expert testimony on the grounds her opinions were not reliable and were not relevant.  Plaintiffs also filed accompanying documents including Doctor's May 2022 deposition testimony.

After Defendants filed a response in opposition, the trial court granted Plaintiffs' motion to exclude Doctor's expert testimony.  Defendants then filed a motion to reconsider and accompanying documents including Doctor's July 2022 deposition testimony.  Defendants argued their motion to reconsider prior to voir dire and indicated to the trial court that their offer of proof included Doctor's May and July 2022 deposition testimony, both of which are set out in relevant part below in Sections II.A.2.a. and b. of this opinion.[8,9]  The trial court ultimately

---

[6] Section 490.065.2 "adopts an approach to the admissibility of expert opinions that is consistent with federal standards[.]"  *Gardner*, 562 S.W.3d at 315-16.

[7] For purposes of this opinion only, we assume without deciding that the other general admissibility requirement of section 490.065.2 was met, i.e., that Doctor was a qualified expert.  *See Huett*, 675 S.W.3d at 521; *see also* section 490.065.2.

[8] Even though Defendants indicated to the trial court that their offer of proof included Doctor's May *and* July 2022 deposition testimony, Defendants' reply brief argues in a conclusory manner that the May 2022 testimony is "not relevant" and should not be considered in this appeal.  Defendants fail to cite to any controlling legal authority in support of this argument, and this Court can find no such authority.  Moreover, Defendants abandoned their contention regarding Doctor's May 2022 deposition testimony during oral argument, when their counsel admitted: (1) it was proper for the trial court to consider the testimony in making its evidentiary ruling at trial; and (2) it is proper for our Court to consider the testimony in reviewing the trial court's evidentiary ruling on appeal.

[9] We note that portions of Mother's deposition testimony cited or quoted in this opinion are not necessarily in the same order as the testimony appears in the deposition itself.

9

denied Defendants' motion to reconsider, making detailed findings and conclusions on the record that are set out in relevant part below in Section II.A.2.c. of this opinion.

**a.**        **Relevant Portions of Doctor's May 2022 Deposition Testimony**

In Doctor's May 2022 deposition, which was filed by Plaintiffs and was part of Defendants' offer of proof, she testified in relevant part as follows. In preparing to testify as an expert in this case, Doctor reviewed several materials including: the dash camera footage from Defendants' 18-wheeler on the date of the accident; the deposition of M.B., who was the driver of the pickup truck that slightly hit Mother's car and caused it to come to a rest on the highway before Defendants' 18-wheeler struck Mother's car; a policy paper from the National Safety Council; Mother's medical records from the date of the accident; a toxicology report from the date of the accident; and Mother's deposition.

The toxicology report showed that at 8:55 a.m. (approximately three hours after the accident), Mother's blood had a level of 3.5 nanograms per milliliter, plus or minus 0.7 nanograms per milliliter, of Delta-9 tetrahydrocannabinol ("THC"), which is an active ingredient of marijuana. Additionally, in Mother's deposition, she testified: she was a regular daily user of THC; she would smoke marijuana "[p]robably two or three" times a day; and she had smoked two "hits" of marijuana "resin" at 4:45 a.m. on the date of the accident (approximately one hour before the accident). Importantly, there is no evidence that Mother smoked marijuana plant on the day of the accident. The evidence is that she smoked the leftover "resin" of the marijuana plant from a previous occasion.

According to Doctor, "resin" is the material left over after THC products are originally consumed. Doctor admitted in her testimony that she had no idea how much THC concentration, if any, the resin smoked by Mother on the morning of the accident had in it, and Doctor also admitted it was possible the resin smoked by Mother may not have had any THC concentration.

Additionally, there is no indication in the record as to: (1) the total number of hits Mother smoked on a daily basis; or (2) whether the substance Mother smoked was marijuana resin or a THC product in its original form such as a marijuana plant.

Doctor testified that based on Mother's toxicology report, Mother's deposition, and the fact Mother "lost control" of her vehicle by fishtailing before Defendants' 18-wheeler collided with it,[10] it was Doctor's opinion that Mother was impaired by THC at the time of the accident. Doctor also believed Mother's alleged impairment manifested itself in the form of divided attention and a slowed reaction time, resulting in Mother losing control of her vehicle and causing the accident.

To the extent Doctor's opinion that Mother was impaired was based on Mother's toxicology report, Doctor made several statements demonstrating it was her opinion Mother was impaired simply because the report showed Mother had *any* amount of THC in her blood after the accident and not because the level of THC in Mother's blood was above a certain threshold.[11] In addition, Doctor admitted a person "cannot draw a relationship between the degree of impairment and blood THC concentration" and that she could not measure or quantify Mother's degree of alleged impairment based on Mother's blood THC concentration reflected in the toxicology report. Doctor further admitted she could not say what effect the level of THC in Mother's blood after the accident had on Mother at the time of the crash.

---

[10] Viewing the evidence and reasonable inferences in the light most favorable to the jury's verdicts, *see Denney*, 665 S.W.3d at 353 n.1, the evidence shows these are the circumstances under which Mother lost control of her vehicle and the accident resulted: (1) Mother was driving in the slower, right hand lane on a blind curve on a wet highway when another car to her left sped up and cut in front of her; (2) the back of Mother's car then "fishtailed," i.e., slid back and forth from left to right, as she tried to avoid the other car, and Mother's car hit the center median wall; and (3) another pickup truck slightly hit Mother's car before Defendants' 18-wheeler collided with it.

[11] These statements included Doctor's opinion testimony that: "[i]f you have . . . any amount of marijuana when you're driving the vehicle, you're considered under the influence"; "if you have a positive blood draw for cannabis, you are automatically under the influence and impaired"; "there is . . . no safe amount under which you can say you're an un[im]paired driver"; "my opinion is that [Mother] was impaired because she ha[d] [the] active ingredient of THC [in her blood]"; "there's no number [in your blood] that if you get under that you are not impaired"; and "I feel very strongly that if you have cannabis in your system, it's an impairing substance."

11

Furthermore, to the extent Doctor's opinion of Mother's impairment was based on Mother's deposition testimony, it appeared Doctor opined Mother was impaired because Mother testified she smoked two hits of marijuana resin approximately one hour before the accident *or* because Mother testified she was a regular daily user of THC.[12] However, Doctor admitted she could not state within a reasonable degree of medical certainty that the marijuana resin Mother smoked the morning of the crash contained any THC concentration or that the THC in Mother's blood toxicology was from the resin. Doctor also agreed there are peer-reviewed articles discussing studies showing THC concentrations can be present in daily cannabis users for at least three days after use, and Doctor admitted the absorption, distribution, and elimination of THC in a person's system varies from individual to individual.

Ultimately, Doctor was unable to provide a methodology or cite any specific symptoms or behavior exhibited by Mother to support Doctor's opinion that Mother was impaired:

| | |
|---|---|
| [Plaintiffs' counsel]: | [C]an you tell us any evidence-based method that you're saying is in th[e] literature that you used and relied on in this case to determine that [Mother] was marijuana impaired? |
| [Doctor]: | I don't – I don't have a method that I can explain to you, no. |

. . .

| | |
|---|---|
| [Plaintiffs' counsel]: | What read[ily] recognizable symptoms [of THC impairment] . . . were present in [Mother]? |
| [Doctor]: | I don't have any symptomology that – that she was [impaired]. . .. |

Similarly, Doctor was unable to testify to a reasonable degree of medical or scientific certainty that Mother's alleged impairment, which Doctor believed manifested itself in the form

---

[12] Doctor admitted she did not know how much of the THC concentration in Mother's blood after the accident, if any, was from Mother smoking resin that morning, and Doctor also admitted that the whole amount of the THC concentration in Mother's blood could have been residual from Mother smoking THC on a prior day.

of divided attention and a slowed reaction time, resulted in Mother losing control of her vehicle and causing the accident:

> [Plaintiffs' counsel]: Do you agree that you cannot state within a reasonable degree of medical certainty how impaired divided attention caused or contributed to cause this crash?
>
> . . .
>
> [Doctor]: . . . I cannot say precisely how it – it contributed or caused this accident, no.
>
> . . .
>
> [Plaintiffs' counsel]: Do you agree that you cannot say within a reasonable degree of medical or scientific certainty that slowed perception-reaction time caused or contributed to cause [Mother] to fishtail?
>
> . . .
>
> [Doctor]: Because I don't know what the stimulus was that she was responding to, I can't say.
>
> . . .
>
> [Plaintiffs' counsel]: Do you agree that you cannot say with scientific certainty that [Mother's] loss of control of her vehicle had anything to do with THC impairment?
>
> [Doctor]: I can't say that with certainty, that's correct.

### b. Relevant Portions of Doctor's July 2022 Deposition Testimony

Defendants' counsel attempted to rehabilitate Doctor's May 2022 deposition testimony set out above by filing Doctor's July 2022 deposition in opposition to Plaintiffs' motion to exclude and by making the July 2022 deposition part of Defendants' offer of proof. Doctor testified in her July 2022 deposition in relevant part as follows. In preparing for her July 2022 deposition, Doctor reviewed the same materials she reviewed for her May 2022 deposition including: Mother's toxicology report showing she had a level of 3.5 nanograms per milliliter, plus or minus 0.7 nanograms per milliliter, of THC in her blood approximately three hours after the accident; and Mother's deposition testimony providing she was a regular daily user of THC and that she had smoked two hits of marijuana resin approximately one hour before the accident. Doctor also reviewed three additional materials in preparing for her July 2022 deposition: (1) a paper titled "The Impact of Prolonged Cannabinoid Excretion in Chronic Daily Cannabis

13

Smokers' Blood on Per Se Drugged Driving Laws" (the "Bergamaschi paper");[13] (2) a paper titled "Psychomotor Function in Chronic Daily Cannabis Smokers During Sustained Abstinence" ("second paper");[14] and (3) a chapter on cannabis in a forensic toxicology textbook.[15]

In Doctor's July 2022 deposition, she opined the level of THC in Mother's blood after the accident directly supported Doctor's belief that Mother was impaired at the time of the accident. Specifically, Doctor's July 2022 deposition shows that: Doctor opined the level of THC in Mother's blood was indicative of "very acute use," i.e., Mother smoking resin containing THC the morning of the accident, when the level in Mother's blood was compared to levels in "chronic" users[16] studied in the Bergamaschi paper and the second paper; Doctor believed the level of THC in Mother's blood would have been considerably higher at the time of the accident compared to the level in Mother's blood approximately three hours after the accident reflected in the toxicology report; and Doctor opined that the level of THC in Mother's blood at the time of the accident would have the effect of divided attention and a slowed reaction time. Doctor also believed that, "[i]f [Mother] did not have acute use, she could also be impaired because she's a [']chronic['] user," and that "chronic" cannabis users "may never be unimpaired."

In her July 2022 deposition, Doctor was able to opine to a reasonable degree of scientific and medical certainty that: Mother was impaired by THC at the time of the accident; and such alleged impairment led to Mother losing control of her vehicle by fishtailing and subsequently leaving her driving lane and striking the median.

---

[13] Plaintiffs' counsel initially presented the Bergamaschi paper to Doctor when questioning her during her May 2022 deposition. The May 2022 deposition provides the Bergamaschi paper is a "peer-reviewed" source from a "journal of analytical toxicology."

[14] The July 2022 deposition provides this second paper is from an unidentified January 2013 "journal," and there is no indication in the record before us whether the second paper is a "peer-reviewed" source.

[15] Doctor's July 2022 deposition testimony demonstrates this forensic toxicology textbook was published in 2014 or earlier.

[16] Based on the record before this Court, the term "chronic" user is not defined by Doctor or the three sources she relies upon in her July 2022 deposition beyond merely equating the term "chronic" user with "daily" user.

###### c. The Trial Court's Detailed Findings and Conclusions in Support of its Decision Excluding Doctor's Testimony on the Bases it Was Not Reliable and Not Relevant

After considering Doctor's May and July 2022 deposition testimony, the trial court denied Defendants' motion to reconsider the exclusion of Doctor's testimony on the bases it was not reliable and not relevant. The trial court made the following detailed findings:

> The [c]ourt finds [] that [Doctor's] opinions on the issues of THC impairment at the time of the accident in question and on causation are not based on sufficient facts or data and are not the product of reliable principles and methods reliably applied to the facts of this case.
>
> Just by way of example, of particular concern to the [c]ourt, [Doctor] acknowledged that there's no way to determine what, if any, THC concentration was in the resin that [Mother] admitted to taking two hits of the morning of the accident in question, yet she went on to refer to [Mother's] marijuana use that day as -- I'm quoting, I think accurately -- very acute use.
>
> [Doctor] also admitted that she does not know what happened when [Mother] lost control of her vehicle and that she does not know what the stimulus was that she responded to, yet she nevertheless went on to opine that her impairment did lead to that loss of control.
>
> The [c]ourt finds that in considering her testimony on that issue in total that amounts to speculation at best . . ..
> . . .
> The [c]ourt finds that [Doctor's] opinions on the impairment and causation issues are also at times inconsistent . . . and that, again, by way of further example, while opining on one hand that [Mother] was impaired, [Doctor] also acknowledged that she does not know what effect the levels of THC in [Mother's] system actually had on her at the time of the crash.
>
> [Doctor] opines that any amount -- she essentially opines that any amount of Delta 9 THC in an individual's system conclusively determines drug impairment and that's an opinion that the [c]ourt finds is not supported by sufficient facts or data in this case.
>
> Given its concerns with the reliability of this opinion testimony, the [c]ourt finds that the probative value of any of [Doctor's] opinions on the issues of THC impairment and causation is heavily outweighed, I think, by the likely prejudicial effect of allowing the jury to hear her speculative opinions on those issues.
> . . .
> . . . [T]he [c]ourt rules that [Doctor] will not be permitted to offer any opinion testimony on [Mother's] THC impairment or causation in this case.

15

**3.     The Trial Court Did Not Abuse its Discretion in Excluding Doctor's Testimony from Trial on the Basis it Was Not Reliable Due to the Inconsistencies in Doctor's Overall Deposition Testimony**

"Reliability [of expert testimony] is determined by considering whether the testimony is based on sufficient facts or data, reliable principles and methods, and reliable application thereof." *Huett*, 675 S.W.3d at 521 (quoting *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. E.D. 2018) (citing section 490.065.2(1)(b)-(d)).

As noted by the trial court, two examples of the inconsistent nature of Doctor's testimony are that: (1) though Doctor opined that Mother was impaired by THC, Doctor also admitted in her testimony that she could not say what effect the level of THC in Mother's blood after the accident had on Mother at the time of the crash; and (2) though Doctor admitted there was no way to determine what, if any, THC concentration was in the marijuana resin smoked by Mother on the morning of the accident, Doctor still referred to Mother's marijuana use that morning as "very acute use."

There are at least three other significant inconsistencies within Doctor's overall testimony from the May and July 2022 depositions. First, in each deposition, Doctor relied on different data and principles in forming her opinions as to Mother's alleged impairment. In Doctor's May 2022 deposition, she opined Mother was impaired at the time of the accident by either recent or "chronic" THC use in part because the toxicology report showed Mother had *any* amount of THC in her blood after the accident and not because the level of THC in Mother's blood was above a certain threshold. In contrast, in Doctor's July 2022 deposition, she opined the specific level of THC in Mother's blood after the accident directly supported Doctor's belief that Mother was impaired at the time of the accident.

Another significant inconsistency within Doctor's overall testimony is that in each deposition, Doctor relied on and applied different methods (if any). In Doctor's May 2022

deposition, she admitted she was unable to provide "any evidence-based method . . . in the literature that [she] used and relied on . . . to determine that [Mother] was marijuana impaired," whereas in Doctor's July 2022 deposition, she relied on and applied findings in the Bergamaschi paper, the second paper, and the textbook chapter relating to "chronic" users of THC.

A final important inconsistency within Doctor's two depositions is the stark difference in the result of the application of Doctor's respective principles or methods. Unlike in Doctor's May 2022 deposition where Doctor admitted she could not state her opinions on impairment and causation were to a reasonable degree of scientific or medical certainty, Doctor testified her opinions met such a standard in her July 2022 deposition.

As held by the Missouri Supreme Court, a trial court is in the best position to determine whether to admit or exclude an expert's testimony based on inconsistencies between two portions of his or her testimony, and "[t]his is necessarily a fact-specific, discretionary determination." *Linton*, 634 S.W.3d at 630. Given the inconsistencies in Doctor's overall deposition testimony and the trial court's detailed findings on the record, it cannot be said that the trial court's decision to exclude Doctor's testimony from trial is clearly against the logic of the circumstances then before the court or is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *See id*. (similarly holding). Therefore, the trial court did not abuse its discretion in excluding Doctor's testimony from trial on the grounds it was not reliable due to the inconsistencies in her overall deposition testimony. *See id*.; *Huett*, 675 S.W.3d at 521; *see also Gardner*, 562 S.W.3d at 319; section 490.065.2(1)(b)-(d).

17

**4.** **The Trial Court Also Did Not Abuse its Discretion in Excluding Doctor's Testimony from Trial on the Basis it Was Not Relevant Because Doctor's Opinions Were Speculative**

To be admissible, expert testimony must be both logically and legally relevant. *See Shallow*, 554 S.W.3d at 883; *State v. Hudson*, 643 S.W.3d 679, 685 (Mo. App. W.D. 2022); *see also* section 490.065.2(1)(a); section 490.065.2(2)(a). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Hudson*, 643 S.W.3d at 685 (quoting *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002)). Evidence is legally relevant if its probative value outweighs its costs – "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.*

In excluding Doctor's testimony from trial in this case, the trial court found Doctor's expert testimony was not logically or legally relevant because "the probative value of any of [Doctor's] opinions on the issues of THC impairment and causation is heavily outweighed . . . by the likely prejudicial effect of allowing the jury to hear her speculative opinions on those issues." *See id.*; *see also Secrist v. Treadstone, LLC*, 356 S.W.3d 276, 281 (Mo. App. W.D. 2011) (holding that evidence is not logically relevant if it is speculative). We hold the trial court's decision is not an abuse of discretion based on Missouri's existing case law, Missouri's current statutory scheme, and the circumstances of this case.

"[Missouri] case law has consistently recognized a substantive distinction between the evidence required to sustain a finding that a person is impaired as a result of the ingestion of alcohol verses other drugs." *Secrist*, 356 S.W.3d at 281. When a person ingests alcohol, a presumption of impairment is set by section 577.012.1(1) RSMo 2016 and is established when a person's blood alcohol concentration reaches eight-hundredths of one percent. *Secrist*, 356 S.W.3d at 280 n.5, 281, 283 (citing a former version of section 577.012 that is substantively identical to the version of the statute applicable in this case). In contrast, there is no presumption

18

of impairment currently set by statute in Missouri with respect to other drugs, legal or illegal. *Secrist*, 356 S.W.3d at 283.[17] Accordingly, in Missouri, "[i]t is not the rule that any level of any drug in a person's system results in an automatic permissible inference of impairment," and "[t]here must be evidence beyond the mere fact that a drug was present in someone's system in a particular quantity before a reasonable inference can be made that the person is impaired therefrom." *Id*. at 282, 283.

We find the Western District's decision in *Secrist*, 356 S.W.3d 276, to be instructive here. In *Secrist*, the plaintiff filed a personal injury action under multiple theories, and the jury found, *inter alia*, the plaintiff was eighty percent at fault for his injuries. *Id*. at 279. On appeal, the plaintiff claimed the trial court erred in admitting the plaintiff's positive drug test result for marijuana reflecting a THC level of 50 ng/ml for purposes of, *inter alia*, comparative fault. *Id*. The Western District agreed, finding the evidence of the plaintiff's THC levels, standing alone, "[wa]s not logically relevant in that without [additional] information [it] lend[ed] itself to rank speculation." *Id*. at 281 (emphasis omitted). The Western District held in relevant part:

> The fact that [the plaintiff] tested positive for 50 ng/ml of THC (marijuana) means nothing without context. Certainly the average juror would have no knowledge as to what this number means as it relates to the level of impairment of the person in whose system it was found. It has been noted by other courts that THC may remain in the blood or urine for days if not weeks after marijuana use, and the physiological effects of marijuana use dissipate long before the THC leaves the system; therefore, without further evidence as to the significance of the particular levels of THC on a person's functioning, THC levels in the person's system are no indication of impairment therefrom . . . .. Also, evidence regarding abnormal behavior is not

---

[17] *Cf.* Governors Highway Safety Association, State Laws on Drug Impaired Driving, https://www.ghsa.org/state-laws/issues/drug%20impaired%20driving (last visited March 22, 2024) (discussing, *inter alia*, the existence of driving while impaired laws in most states that have legalized recreational marijuana and providing: (1) Alaska, California, Connecticut, the District of Columbia, Maine, Maryland, Massachusetts, Oregon, Vermont, and Virginia (like Missouri) do not have a law providing a person is presumptively or per se impaired by marijuana when a certain level of THC is in his system; (2) Colorado has a law stating there is a permissible inference a person is driving while impaired by marijuana when there is 5 nanograms per milliliter or more of THC in his system; (3) Illinois and Washington have laws stating a person is per se driving while impaired when there is 5 nanograms per milliliter or more of THC in his system; (4) Michigan has a law stating there is zero tolerance for THC; (5) Minnesota has a law stating there is zero tolerance for THC but no restriction on metabolites; and (6) Nevada has a law providing a person is per se driving while impaired when the offense is a felony violation and he has a level of 2 nanograms per millimeter or more of THC in his system).

> sufficient without some evidence that the behavior is consistent with identifiable symptoms of ingestion of the particular drug. [*State v.*] *Friend*, 943 S.W.2d [800,] 803 [Mo. App. W.D. 1997]. Popular stereotypes regarding the characteristics and behaviors of drug users are not sufficient in a court of law. Evidence of the level of drugs in the person's system is meaningless to the layperson until there is *some* evidence as to what effect those levels of that drug in a person's system would be expected to have on the individual in question. *Id.*

*Secrist*, 356 S.W.3d at 282-83 (footnote and citations to cases from other jurisdictions omitted) (emphasis in original). The *Secrist* Court further held that in order for an individual's THC levels to be logically relevant, there must be "more evidence to give the jury an indication . . . : (1) [as to] what effect that level of that drug in the body would reasonably have on that individual; (2) that the behaviors exhibited by that person were consistent with having that drug and the amount thereof in his system; and (3) [as to] the proximity in time between when the drug was ingested and the events to which the impairment is relevant" ("*Secrist*'s three-part test"). *Id*. at 283.

We hold Doctor's overall deposition testimony does not meet any portion of *Secrist*'s three-part test because, as the trial court found, Doctor's opinions were speculative.

The first prong of *Secrist*'s three-part test concerns what effect the level of the THC found in Mother's blood approximately three hours after the accident (3.5 nanograms per milliliter, plus or minus 0.7 nanograms per milliliter) would have reasonably had on Mother at the time of the accident. *See id*. The fact that Mother tested positive for THC at this level means nothing without context, *see id*. at 282, and we find the context provided by Doctor is insufficient. Specifically, Doctor admitted in her May 2022 deposition testimony opinion that: a person "cannot draw a relationship between the degree of impairment and blood THC concentration"; Doctor could not measure or quantify Mother's degree of alleged impairment based on Mother's blood THC concentration reflected in the toxicology report; Doctor could not say what effect the level of THC in Mother's blood after the accident had on Mother at the time

of the crash; and Mother was a "chronic" daily user of THC. Moreover, "THC may remain in the blood . . . for days if not weeks after marijuana use, and the physiological effects of marijuana use dissipate long before the THC leaves the system; therefore, without further evidence as to the significance of the particular levels of THC on a person's functioning, THC levels in the person's system are no indication of impairment therefrom." *Id*. at 283. Under these circumstances, the trial court did not abuse its discretion in finding Doctor's opinions as to Mother's impairment and causation were speculative, and, therefore, Doctor's testimony does not meet the first prong of *Secrist*'s three-part test.[18] *See id*.

The second prong of *Secrist*'s three-part test, essentially relating to any behaviors exhibited by Mother consistent with THC use, was also not met in this case. *See id*. Doctor believed Mother's THC impairment manifested itself in the form of divided attention and a slowed reaction time resulting in Mother losing control of her vehicle and causing the accident. However, Doctor's opinions were speculative in this regard because: Doctor was unable to cite any specific symptoms or behavior exhibited by Mother to support Doctor's opinion that Mother was impaired except for the fact Mother lost control of her car and fishtailed; and Doctor admitted she did not know what the stimulus was that Mother responded to which caused her to lose control of her vehicle and fishtail. In sum, there was simply insufficient evidence connecting Mother's only demonstrated symptoms or behaviors – losing control of her car and then fishtailing – with ingestion of THC. *See Friend*, 943 S.W.2d at 801-03 (evidence that an

---

[18] We recognize Doctor effectively attempted to change her testimony during her July 2022 deposition and had different opinions about what the effect of the level of the THC found in Mother's blood approximately three hours after the accident would have had on Mother at the time of the accident. For example, Doctor opined in her July 2022 deposition that the level of THC in Mother's blood at the time of the accident would have the effect of divided attention and a slowed reaction time. However, as set out below when discussing the second prong of *Secrist*'s three-part test, this opinion was speculative because, *inter alia*, there was simply insufficient evidence connecting Mother's only demonstrated symptoms or behaviors – losing control of her car and then fishtailing – with ingestion of THC. Moreover, the trial court was in the best position to determine whether to admit or exclude Doctor's expert testimony as speculative based on inconsistencies between the two portions of Doctor's deposition testimony, and "[t]his [was] necessarily a fact-specific, discretionary determination." *See Linton*, 634 S.W.3d at 630.

individual ingested a drug, drove in the wrong lane of traffic, and exhibited bizarre behavior was not admissible to show drug impairment because, *inter alia*, there was insufficient evidence connecting the person's driving issues with the ingestion of the drug); *Simpson v. Smith*, 771 S.W.2d 368, 370-72 (Mo. App. S.D. 1989) (evidence of a person's drug use was not admissible to show he was driving negligently where, as here, there was no showing the individual was driving erratically).[19]

We now turn to the last prong of *Secrist*'s three-part test, i.e., "the proximity in time between when the drug was ingested and the events to which the impairment is relevant." *Secrist*, 356 S.W.3d at 283. We find Doctor's opinions on this issue were speculative under the circumstances of this case because it is unclear from Doctor's overall testimony whether the level of THC in Mother's blood approximately three hours after the accident was a result of either Mother smoking two hits of resin approximately one hour before the accident *or* her regular daily cannabis use. In Doctor's May and July 2022 depositions, she essentially opined that Mother was impaired by *either* recent *or* "chronic" daily cannabis use, while Doctor admitted in her May 2022 deposition that the absorption, distribution, and elimination of THC in a person's system varies from individual to individual. Additionally, Doctor testified in her May 2022 deposition that it was possible the resin Mother smoked approximately one hour before the

_____

[19] We note Missouri case law suggests evidence regarding an individual's drug impairment or causation may be admissible when, in addition to evidence of his or her drug ingestion, there is also evidence such as: (1) "extreme and dangerous driving" in the form of hitting multiple different objects coupled with directly observable physical indicators of impairment, *see State v. Book*, 436 S.W.3d 671, 677-80 (Mo. App. S.D. 2014) (hydrocodone and alcohol); (2) multiple traffic violations, "erratic driving" in the form of "driving all over the roadway" and weaving, coupled with directly observable physical indicators of impairment, *see Hill v. Director of Revenue*, 424 S.W.3d 495, 498-501 (Mo. App. W.D. 2014) (generic Zoloft and another unknown drug); (3) hitting a parked car coupled with directly observable physical indicators of impairment, *see State v. Honsinger*, 386 S.W.3d 827, 830-31 (Mo. App. S.D. 2012) (Xanax, alcohol, and marijuana); and (4) dangerous and erratic driving in the form of blocking traffic at an intersection for thirty to sixty seconds, changing lanes without signaling and in a manner to cut off another driver, and hitting a stationary vehicle, coupled with directly observable physical indicators of impairment, *see State v. Hoy*, 219 S.W.3d 796, 800-08 (Mo. App. S.D. 2007) (hydrocodone and a sleep disorder drug). These aforementioned cases are distinguishable because, here, there was no evidence adduced that Mother engaged in any such "extreme," "dangerous," or "erratic" driving on the day of the accident, and there was no evidence adduced that Mother had any directly observable physical indicators of impairment on the day of the accident.

accident did not contain any amount of THC. Furthermore, with respect to Mother's regular daily use of cannabis, Doctor agreed there are peer-reviewed articles discussing studies showing THC concentrations can be present in daily cannabis users for at least three days after use. Moreover, this Court can find no Missouri case authorizing a finding of impairment based only upon a person's regular daily usage of marijuana.

In sum, Doctor's overall deposition testimony does not meet any portion of *Secrist*'s three-part test. Moreover, the trial court did not abuse its discretion in excluding Doctor's testimony from trial on the basis her opinions were speculative, and, therefore, were not logically or legally relevant. *See id*. at 281-83; *see also Hudson*, 643 S.W.3d at 685 (citing *Anderson*, 76 S.W.3d at 276).

### 5. Conclusion as to Defendants' First Point on Appeal

Based on the foregoing, we affirm the trial court's decision excluding Doctor's expert testimony on the issues of THC impairment and causation for two independent reasons: (1) the trial court did not abuse its discretion in excluding Doctor's testimony on the basis it was not reliable; and (2) the trial court did not abuse its discretion in excluding Doctor's testimony on the basis it was not relevant.[20] Defendants' first point on appeal is denied.

---

[20] We note Defendants argue on appeal that any issues with the reliability or relevancy of Doctor's expert testimony should go to the weight to be given to her opinions by the jury rather than its admissibility. We disagree. The reliability and relevancy of an expert's testimony goes to the admissibility of the testimony because expert testimony is inadmissible where, like Doctor's testimony in this case, it is not reliable or relevant. *See Huett*, 675 S.W.3d at 521; *see also* section 490.065.2. Defendants' argument that any issues with Doctor's testimony should go to its weight also has no merit because of our holding in the previous subsections that the trial court did not abuse its discretion in excluding Doctor's testimony from trial on the basis her opinions were inconsistent and speculative. *See Huett*, 675 S.W.3d at 524-25 (rejecting a similar argument and holding in relevant part that "[a]n expert witness's opinion must have a rational basis and be founded on substantial information, not mere . . . speculation") (citation and internal quotations omitted); *see also Linton*, 634 S.W.3d at 630; *cf. Penzel Construction Company, Inc. v. Jackson R-2 School District*, 544 S.W.3d 214, 230 (Mo. App. E.D. 2017) (holding issue with expert testimony went to its weight instead of its inadmissibility where, *unlike here*, there was an argument on appeal relating to the expert's lack of experience); *Freight House Lofts Condo Ass'n v. VSI Meter Services, Inc.*, 402 S.W.3d 586, 596 (Mo. App. W.D. 2013) (holding issue with expert testimony went to its weight instead of its admissibility where, *unlike here*, there was an argument on appeal that the expert's opinion was based on an event found in other witness's depositions rather than the expert's first-hand knowledge).

**B.** **Whether the Trial Court Erred in Failing to Limit Plaintiffs to Participation by One Attorney in Various Stages of the Trial**

In Defendants' second point on appeal, they contend the trial court erred in failing to limit Plaintiffs (Decedent's Mother and Father), who had retained separate counsel and who were divorced, to participation by one attorney in various stages of the trial. For the reasons discussed below, we disagree.

### 1. Relevant Facts and Procedural Posture

Prior to voir dire, Defendants filed and argued a motion requesting the trial court limit Plaintiffs' participation to one attorney in various stages of the trial. The trial court denied Defendants' motion.

Subsequently, Plaintiffs' separate counsel actively participated during the following portions of trial: voir dire; opening statements; direct and re-direct examination of Defendant Beck and Mother; cross-examination of Defendant Great Plains' safety director and president; cross and re-cross examination of a defense liability expert; closing and rebuttal arguments during the first phase of the trial pertaining to compensatory liability and damages and to aggravating circumstances liability; and closing arguments during the second phase of the trial pertaining to aggravating circumstances damages.

After the jury entered its verdicts, Defendants filed a post-trial motion raising the claim at issue in this point on appeal, and the trial court denied Defendants' motion.

### 2. Standard of Review

For purposes of this appeal only, we assume *arguendo* that Defendants have preserved their claim that the trial court erred in failing to limit Plaintiffs to participation by one attorney in various stages of the trial. An appellate court reviews a preserved challenge to a trial court's rulings regarding voir dire, opening argument, examination of witnesses, and closing argument for an abuse of discretion. *See Eoff v. McDonald*, 578 S.W.3d 380, 383 (Mo. banc 2019) (voir

24

dire); *Nelson v. Waxman*, 9 S.W.3d 601, 607 (Mo. banc 2000) (opening argument); *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 46 (Mo. App. E.D. banc 2013) (closing argument); *Deveney v. Smith*, 812 S.W.2d 810, 814 (Mo. App. W.D. 1991) (examination); *see also Moore v. Missouri Highway and Transportation Commission*, 527 S.W.3d 215, 220 (Mo. App. E.D. 2017) ("[t]he standard of review for *preserved* error in cross-examination is that of an abuse of discretion") (emphasis in original).

A trial court abuses its discretion when its decision "is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Linton*, 634 S.W.3d at 627 (citation omitted). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Id*. (citation omitted). Additionally, a trial court's judgment will only be reversed if an erroneous ruling results in prejudice, which occurs when the error materially affected the merits of the action. *Id*.; *Andress*, 624 S.W.3d at 901.

### 3. Analysis of Defendants' Arguments on Appeal and Conclusion as to Defendants' Second Point on Appeal

In support of Defendants' claim on appeal that the trial court erred in failing to limit Plaintiffs' participation to one attorney in various stages of trial, Defendants primarily rely on *Thompson v. Curators of University of Missouri*, 488 S.W.2d 617 (Mo. 1973).

In *Thompson*, three plaintiffs filed a will contest against two defendants. *Id*. at 618. Counsel for both of the defendants requested separate cross-examination of the plaintiffs' witnesses, and the trial court effectively denied their request. *Id*. at 620. On appeal, the defendants challenged the trial court's ruling. *Id*. at 620-21. The Missouri Supreme Court ruled against the defendants and held the trial court did not abuse its discretion in limiting the

25

defendants to participation by one attorney during cross-examination, finding in relevant part that:

> A trial court may properly exercise its discretion as to the scope and extent of cross-examination . . .. The extent and scope of cross-examination in a civil proceeding is discretionary with the trial court and its rulings with respect thereto will not be disturbed unless an abuse of discretion is clearly shown. *In connection with a case involving multiple defendants, the general rule . . . is: Where there are several codefendants, counsel of each may cross-examine plaintiff's witnesses, and in a consolidated action any party may cross-examine the witnesses of any other party; but it is undesirable for more than one attorney to cross-examine the same witnesses, and the right may be denied where the interests of the codefendants are identical.*

> It is obvious that [this involves] an area . . . that does not lend itself to the establishment of a rigid rule.

*Id.* at 620 (internal quotations and citations omitted) (emphasis added).

We find Defendants' reliance on *Thompson* is misplaced. The *Thompson* Court's decision is largely based on the above-emphasized "general rule" applicable to cases involving multiple co-defendants, and this Court can find no legal authority finding there is a similar rule applicable to cases, like this one, involving multiple co-plaintiffs. *See id.* Nevertheless, even if a similar rule would apply to cases involving multiple co-plaintiffs, and, therefore, "[it would be] undesirable for more than one [plaintiff's] attorney to cross-examine the same witness[]," *Thompson* demonstrates the trial court's decision whether to limit co-parties to participation by one attorney during the same stages of trial is a discretionary decision that should be upheld if no abuse of discretion is shown. *See id.*; *see also State v. Hendrix*, 646 S.W.2d 830, 833 (Mo. App. W.D. 1982) ("[t]he control of the trial of the case rests with the court, and the conduct of counsel is subject to that authority and discretion").

Recognizing the trial court's discretionary authority, and as the Supreme Court held in *Thompson*, we hold the trial court did not clearly abuse its discretion in making its decision whether to limit co-parties to participation by one attorney during the same stages of trial. *See*

*id.*  In this case, although Mother and Father were both parents of Decedent, they were divorced at the time of trial, Mother was driving one of the vehicles involved in the fatal accident, and Mother and Father each made a personal and financial decision to hire separate counsel in this case.  We hold the trial court's decision is not clearly against the logic of these circumstances before the court and is not so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.  *See Linton*, 634 S.W.3d at 627.  In other words, we hold the trial court's ruling which failed to limit Plaintiffs to participation by one attorney in various stages of trial does not constitute an abuse of discretion.  *See id.*  Defendants' second point on appeal is denied.[21]

**C.      Whether the Trial Court Erred in Submitting the Proffered Negligence Verdict-Directing Instruction**

In Defendants' third point on appeal, they claim the trial court erred in submitting Instruction No. 7, the proffered negligence verdict-directing instruction.  Instruction No. 7, which is referred to as a "disjunctive" instruction because it contains alternative submissions of acts or omissions giving rise to Defendants' liability, *see Bell v. Redjal*, 569 S.W.3d 70, 84 (Mo. App. E.D. 2019), provided in relevant part that:

Your verdict must be for [Plaintiffs] and against [Defendants], if you believe:

First, either:

*[Defendant Beck] failed to keep a careful lookout*, or

[Defendant Beck] drove at an excessive speed, or

---

[21] Defendants also argue that the trial court erred in failing to limit Plaintiffs to participation by one attorney in various stages of trial because this case involves a wrongful death action which: (1) creates "an indivisible cause of action in favor of [Plaintiffs as] the parents [of Decedent]"; and (2) allows Plaintiffs "a single recovery for their equal benefit."  *See, e.g., State ex rel. Slibowski v. Kimberlin*, 504 S.W.2d 237, 239 (Mo. App. 1973).  Essentially, Defendants are advocating for a per se rule that a trial court cannot ever allow two parents in a wrongful death action to have separate counsel actively participate in any given stage of a trial.  "[] Defendants have failed to cite to any controlling legal authority in support of this argument, and we can find no such legal authority.  Accordingly, it has no merit."  *See Lowe v. Mercy Clinic East Communities*, 641 S.W.3d 210, 229 (Mo. App. E.D. 2021) (similarly holding).

27

[Defendant Beck] drove at a speed which made it impossible for [Defendant Beck] to stop within the range of [Defendant Beck's] visibility[.]

. . .

(emphasis added). On appeal, Defendants argue the trial court erred in submitting Instruction No. 7 because the allegation therein that "[Defendant Beck] failed to keep careful lookout" was not supported by substantial evidence. Defendants made the same claim at trial and in their post-trial motion.

### 1. Standard of Review and General Law

For purposes of this appeal only, we assume *arguendo* that Defendants have preserved their instructional claim. When an instructional claim is preserved, the issue of whether a jury was instructed properly is a question of law that an appellate court reviews *de novo*. *Ross–Paige v. Saint Louis Metropolitan Police Department*, 492 S.W.3d 164, 172 (Mo. banc 2016).

In order for a disjunctive verdict-directing jury instruction to be deemed appropriate, each alternative submission must be supported by substantial evidence "from which the jury could reasonably find such issue." *Id.*; *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010) (citation omitted). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Id.* (citations omitted). In determining whether an alternative submission in a disjunctive instruction is supported by substantial evidence, our Court must consider the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff and disregard all unfavorable inferences. *Zempel v. Slater*, 182 S.W.3d 609, 619 (Mo. App. E.D. 2005).

A defendant operating a vehicle has the highest duty of care to keep a lookout ahead and laterally for "dangerous situations and conditions" so he can "take appropriate precautionary measures to avoid injury to [himself] and other persons within an existing area of peril." *See id.*; *Bushong v. Marathon Elec. Mfg. Corp.*, 719 S.W.2d 828, 831-32 (Mo. App. S.D. 1986)

28

(emphasis omitted) (quoting *Miller v. St. Louis Public Service Co.*, 389 S.W.2d 769, 771 (Mo. 1965)); *Hawkins v. Whittenberg*, 587 S.W.2d 358, 361 (Mo. App. S.D. 1979) (citing, *inter alia*, *Trimble v. Sipes*, 506 S.W.2d 353, 355 (Mo. 1974)). "[W]hat constitutes negligence in failing to keep a lookout in a particular direction at a particular time or place, and whether a driver who has looked has seen all that he should, is usually a fact question." *Wellhausen v. Harris*, 654 S.W.2d 101, 104 (Mo. App. E.D. 1983) (citation and internal quotations omitted).

"Alleged negligent failure to keep a careful lookout is not to be submitted to the jury unless there is substantial evidence from which the jury could find that, in the exercise of the highest degree of care, the allegedly negligent party, had he kept a careful lookout, could have seen the other vehicle in time thereafter to have taken effective precautionary action [to have avoided the collision]." *Hayes*, 313 S.W.3d at 650 (citation omitted). In other words, "[t]he evidence must support a finding that a driver had the means and ability to have avoided a collision." *Id*. The means and ability to avoid a collision includes "the existence of sufficient time and distance, considering the movements and speeds of the vehicles, to enable the party charged (with negligence) to take effective action in avoidance." *Williams v. M. C. Slater, Inc.*, 590 S.W.2d 357, 359 (Mo. App. E.D. 1979) (citation omitted); *see also Hayes*, 313 S.W.3d at 650. Finally, circumstantial evidence is sufficient to make a submissible claim alleging a defendant failed to keep a careful lookout. *Savage v. Dittrich*, 589 S.W.3d 628, 634 (Mo. App. E.D. 2019); *Slater*, 590 S.W.2d at 359.

### 2. Analysis of Defendants' Argument on Appeal and Conclusion as to Defendants' Third Point on Appeal

Defendants argue Instruction No. 7 was erroneously submitted because, *inter alia*, there was no substantial evidence adduced that Beck failed to keep a careful lookout "ahead of him" "for the lane of traffic he was driving in." This argument has no merit because: (1) under Missouri case law, a defendant operating a vehicle has the highest duty of care to keep a lookout

29

ahead *and laterally* for "dangerous situations and conditions" so he can "take appropriate precautionary measures to avoid injury to [himself] and other persons within an existing area of peril";[22] and (2) for the reasons discussed in detail below, we hold there was substantial evidence in this case that Beck failed to keep a careful lookout laterally for a dangerous traffic situation on the highway so he could take appropriate precautionary measures to avoid injury to persons in other vehicles within an existing area of peril, including Decedent.

The facts relevant to this point are as follows. As Beck was driving through Wentzville on eastbound Highway 70 with his cruise control set at 70 mph in the dark and in the rain, he encountered slower traffic in the right lane. To avoid needing to slow down, Beck moved to the fast lane and did not disengage his cruise control set at 70 mph.

Beck then passed a flashing yellow light and sign notifying drivers there was a curve ahead which had a 60 mph advisory speed limit. Beck did not lessen his speed to the advisory speed limit, and instead drove and accelerated into the curve with his cruise control still set at 70 mph, subsequently colliding with Mother's car.

Considering the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs and disregarding all unfavorable inferences, *see Zempel*, 182 S.W.3d at 619, we hold there was substantial evidence from which the jury could have reasonably found Beck failed to keep a careful lookout laterally for the dangerous traffic situation presented by the flashing yellow light and sign notifying drivers there was a curve ahead which had a 60 mph advisory speed limit under the circumstances of this case.

Plaintiffs' trucking safety expert testified professional drivers of 18-wheelers with CDLs are supposed to "keep an eye out for [advisory speed limit] signs and be able to recognize them"

---

[22] *See Zempel*, 182 S.W.3d at 619; *Bushong*, 719 S.W.2d at 831-32 (emphasis omitted) (quoting *Miller*, 389 S.W.2d at 771); *Hawkins*, 587 S.W.2d at 361 (citing, *inter alia*, *Trimble*, 506 S.W.2d at 355).

and that advisory speed limits for curves are mandatory for such drivers. The flashing yellow light and sign notifying drivers there was a curve ahead which had a 60 mph advisory speed limit not only alerted Beck to a posted speed he was required to slow to, but also indicated visibility was limited because of the curvature of the roadway. Additionally, because of Beck's history of driving through the curve approximately fifty times, Beck knew he could not see around the curve.

A defendant operating a vehicle has the highest duty of care to keep a careful lookout, and this duty includes the obligation to maintain a lookout and be observant of signs installed to minimize inherent dangers. *Rakestraw v. Norris*, 478 S.W.2d 409, 419 (Mo. App. 1972). In this case, because Beck did not respond to the advisory speed limit sign by lessening his speed, we hold there was substantial evidence from which the jury could have reasonably found Beck failed to keep a careful lookout by failing to observe the sign indicating the inherent danger of limited visibility of the curve. *See id*. Our holding is confined to the circumstances of this case, where before Beck encountered the advisory speed limit sign, there were other dangerous traffic conditions present laterally to Beck in the form of other vehicles slowing down. Plaintiffs' trucking safety expert testified that if vehicles are driving in an adjacent lane, an 18-wheeler must adjust and reduce its speed to go with the flow of traffic in the adjacent lane because slowing traffic could signal a crash, a disabled vehicle, or some other hazard. The expert further testified that a professional driver is "supposed to anticipate all of those things as potential hazards and create a plan for how to respond to that." Under these circumstances, there was substantial evidence from which the jury could have reasonably found Beck failed to keep a careful lookout laterally for the dangerous traffic situation presented by the flashing yellow light and sign notifying drivers there was a curve ahead which had a 60 mph advisory speed limit.

There was also substantial evidence that had Beck kept a careful lookout laterally for the advisory speed limit sign and reduced his speed upon seeing it, he could have seen Mother's vehicle in time to have taken effective precautionary action to have avoided the collision. *See Hayes*, 313 S.W.3d at 650. Specifically, Plaintiffs' accident reconstructionist expert testified to a reasonable degree of engineering certainty that if Beck had reduced his speed to 60 mph, he would have avoided impact with Mother's vehicle.

Based on the foregoing, there was substantial evidence from which the jury could have reasonably found that, in the exercise of the highest degree of care, Defendant Beck, had he kept a careful lookout, could have seen Mother's vehicle in time to have taken effective precautionary action and avoided the collision. *See id.* In other words, the evidence supported a finding that Beck "had the means and ability to have avoided [the] collision." *See id.* Therefore, Defendants' argument that the trial court erred in submitting Instruction No. 7 because the allegation therein that "[Defendant Beck] failed to keep careful lookout" was not supported by substantial evidence lacks merit. Defendants' third point on appeal is denied.

D.      **Whether the Trial Court Erred in Submitting Claims for Aggravating Circumstances Damages Against Defendant Beck and Defendant Great Plains**

In Defendants' fourth and final point on appeal, they argue the trial court erred in submitting claims for aggravating circumstances damages[23] against Defendant Beck and Defendant Great Plains. It is undisputed Defendants preserved this argument for appeal because it was raised in their motion for directed verdict and renewed in their motion for JNOV. *See Rhoden v. Missouri Delta Medical Center*, 621 S.W.3d 469, 476 (Mo. banc 2021).

---

[23] Aggravating circumstances damages in a wrongful death case are the equivalent of punitive damages in other types of cases, and the same factors are used to determine the submissibility of each type of damages. *Poage v. Crane Co.*, 523 S.W.3d 496, 526 (Mo. App. E.D. 2017) (citing *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000) and *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996)). Accordingly, Missouri Courts have historically used the terms "aggravating circumstances damages" and "punitive damages" interchangeably, *Poage*, 523 S.W.3d at 526, and our opinion will do so here.

### 1. General Law and Standard of Review

The purpose of aggravating circumstances damages "is to punish the defendant and deter future wrongdoing." *Coon v. American Compressed Steel, Inc.*, 207 S.W.3d 629, 637 (Mo. App. W.D. 2006). Where, as in this case, there are multiple defendants, aggravating circumstances damages "are to be assessed against each tortfeasor depending, among other facts, upon his degree of culpability." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 715 (Mo. App. E.D. 2020) (citation omitted).

Whether there is sufficient evidence to support the submission of aggravating circumstances damages is a question of law that our Court reviews *de novo*. *Koon v. Walden*, 539 S.W.3d 752, 773 (Mo. App. E.D. 2017). In making this determination, we review the evidence and reasonable inferences in the light most favorable to the jury's verdict and we disregard all contrary evidence and inferences. *Ingham*, 608 S.W.3d at 714; *Kelly v. Bass Pro Outdoor World, LLC*, 245 S.W.3d 841, 849 (Mo. App. E.D. 2007). "Only evidence that tends to support the submission should be considered." *Ingham*, 608 S.W.3d at 714 (citation omitted); *Tubbs v. BNSF Railway Company, Inc.*, 562 S.W.3d 323, 340 (Mo. App. W.D. 2018) (citation omitted).

In order to submit a claim for aggravated circumstances damages to a jury, a plaintiff must demonstrate by clear and convincing evidence that the defendant showed a complete indifference to or a conscious disregard for the safety of others. *Ingham*, 608 S.W.3d at 714. "Clear and convincing evidence is that which tilts the scales in the affirmative when weighed against the evidence in opposition; [in other words, it is] evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Id*. (citation omitted). Ultimately, a submissible case for aggravating circumstances damages is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude the plaintiff

33

established with convincing clarity "that the defendant knew or had information from which he, in the exercise of ordinary care, should have known that the alleged negligent conduct created a high degree of probability of injury, and thereby showed complete indifference or conscious disregard for the safety of others."[24]  *See Coon*, 207 S.W.3d at 637; *see also Ingham*, 608 S.W.3d at 715; *Koon*, 539 S.W.3d at 773; *Kelly*, 245 S.W.3d at 849.

### 2. The Trial Court Did Not Err in Submitting a Claim for Aggravating Circumstances Damages Against Defendant Beck

In this case, we hold the evidence and the inferences drawn therefrom were sufficient to permit a reasonable juror to have concluded Plaintiffs established with convincing clarity that Defendant Beck knew or should have known his failure to follow regulations and industry standards concerning trucking safety – specifically CDL manual requirements – created a high probability of injury, thereby showing a complete indifference or conscious disregard for the safety of others.  *See Coon*, 207 S.W.3d at 637-39 (similarly holding with respect to a defendant's failure to follow CDL manual requirements); *see also Ingham*, 608 S.W.3d at 715; *Koon*, 539 S.W.3d at 773; *Kelly*, 245 S.W.3d at 849.  In making this determination, we find the Western District's decision in *First Nat. Bank of Fort Smith v. Kansas City Southern Ry. Co.*, 865 S.W.2d 719 (Mo. App. W.D. 1993) ("*First National Bank*") to be instructive.

### a. The Western District's Decision in *First National Bank*

In *First National Bank*, plaintiff Arthur Santos Felix ("the plaintiff")[25] sued a railroad for injuries he suffered when a railroad employee driving a railroad vehicle called a "hy-rail truck" ran over the plaintiff.  *Id.* at 725.  The trial court entered a judgment in accordance with the

---

[24]"In this way . . . though [a defendant] may have had 'no specific intent to injure,' the defendant's awareness – from his knowledge of surrounding circumstances – that his conduct would probably result in injury demonstrates that his actions were 'tantamount to intentional wrongdoing.'"  *Koon*, 539 S.W.3d at 773 (citation omitted).

[25] The style of the case in *First National Bank* indicates First National Bank of Fort Smith ("the bank") was the plaintiff because the bank was conservator of Arthur Santos Felix's estate; however, the Western District's opinion explicitly "regard[ed] [Arthur Santos] Felix as [the] plaintiff" for purposes of its opinion, and we will do so for purposes of our opinion as well.  *First National Bank*, 865 S.W.2d at 725 n.1.

jury's verdict awarding the plaintiff compensatory damages, but the court directed a verdict against the plaintiff on his claim for punitive damages. *Id.* On appeal, the plaintiff argued the trial court erred in directing a verdict on punitive damages, claiming he made a submissible case for such damages because the evidence established: (1) the railroad's employee knowingly violated the railroad's rules requiring him to keep a constant lookout and requiring him to drive at a speed which would allow him to stop for obstructions; and (2) the railroad employee's violation of these rules presented a high probability of injury. *Id.* at 725, 728.

The Western District agreed, finding in relevant part:

[A] violation of an industry custom or standard does not necessarily equate to a violation of a legal standard of care. 'The duty of care is an objective standard determined by what an ordinary careful and prudent person would have done under the same or similar circumstances.' *Pierce v. Platte–Clay Electric Cooperative, Inc.,* 769 S.W.2d 769, 772 (Mo. banc 1989). [The railroad employee's] knowing violations of [the railroad's] rules do not in and of themselves establish a breach of his duty of care. It is a matter for the jury to decide whether an ordinary careful and prudent hy-rail driver would not have violated [the railroad's] rules and whether the violations of the rules amounted to a reckless indifference to the rights of others and presented a high probability of injury.

. . .

A jury could have found that [the railroad employee] intentionally violated [the railroad's rules requiring him to keep a constant lookout and requiring him to drive at a speed which would allow him to stop for obstructions] and determined that an ordinary careful and prudent hy-rail driver would not have done so under the same or similar circumstances.

. . .

[The railroad employee] admitted that he was driving at 25 to 30 miles per hour. A jury could have found that the speed limit was 20 miles per hour, that [the railroad employee] willfully exceeded the speed limit and that an ordinary careful and prudent hy-rail driver would not have exceeded the speed limit under the same or similar circumstances.

. . .

Viewing [the] evidence in the light most favorable to [the plaintiff], we conclude that it was sufficient to present a jury issue as to whether [the railroad employee] acted with a conscious disregard or with complete indifference for the safety of others. An intentional violation of safety rules meant to provide safety to the public

35

would meet the standard for punitive damages if an ordinary careful and prudent hy-rail driver would not have violated the safety rules and those violations created a high probability of injury. A jury could have concluded from the evidence proffered by [the plaintiff] that [the railroad employee] consciously disregarded the safety of others by looking down and not watching where he was going while speeding through an area he knew was populated.

*First National Bank*, 865 S.W.2d at 729-30.

### b.      Analysis of the Evidence in this Case

Here, similar to the circumstances in *First National Bank*, a reasonable juror could have found from the evidence in this case that: (i) Beck intentionally violated four separate CDL manual requirements by failing to reduce his speed during the timeframe leading up to the accident, and that an ordinary careful and prudent driver of a fully loaded 18-wheeler tractor trailer truck would not have done so under the same or similar circumstances; (ii) Beck willfully exceeded the speed limit by keeping his cruise control set at 70 mph going into the wet, blind curve where the fatal accident occurred, and that an ordinary careful and prudent driver of a fully loaded 18-wheeler tractor trailer would not have exceeded the speed limit under the same or similar circumstances; (iii) Beck's intentional violations of the four separate CDL requirements created a high probability of injury; and (iv) Beck consciously disregarded the safety of others by speeding into the curve he knew he would be driving "blind" through.

### i.-ii.      Evidence of Beck's Intentional Violation of Four Separate CDL Manual Requirements, his Willful Exceeding of the Speed Limit, and his Deviation from the Applicable Standard of Care

At trial, Beck admitted he was required to comply with Missouri's CDL manual. The CDL manual requires professional truck drivers to reduce their speed in four circumstances which were applicable to the road conditions at or near the time of the accident in this case: reduced traction, traffic, curves, and limited visibility. The evidence adduced at trial showed that

36

Beck violated these four separate CDL manual requirements by failing to reduce his speed during the timeframe leading up to the accident.

With respect to reduced traction, Beck admitted that the CDL manual required him to reduce his speed by 1/3 of the posted speed limit when driving on a wet road ("the mandatory CDL wet road speed") and Beck stated he understood it takes "twice as long, twice the amount of time and distance as it would to come to a stop [on a wet road] as it would on a dry road." Although the evidence at trial showed Highway 70 was wet prior to and at the time of the accident, Beck did not reduce his speed whatsoever. Instead, Beck kept his cruise control set at 70 mph as he drove into the curve, and his vehicle traveled into the curve at 69-70 mph. Plaintiffs' accident reconstructionist expert testified: (1) the CDL manual required Beck to reduce his speed to 2/3 of the posted speed limit of 65 mph, i.e., 43 mph; and (2) if Beck would have reduced his speed to 43 mph, Beck's truck would have stopped 175.85 feet short of Mother's vehicle and the collision would not have occurred. In this case, however, Beck exceeded the mandatory CDL wet road speed by 26-27 mph, thereby violating this CDL requirement.

As to traffic, the CDL manual provides that when there is traffic such that vehicles are driving slower in the adjacent lane, a tractor-trailer driver is required to reduce his speed to go with the flow of traffic in the adjacent lane because slowing traffic might signal a crash, a disabled vehicle, or some other hazard. Plaintiffs' trucking safety expert testified a tractor-trailer driver is "supposed to anticipate all of those things as potential hazards and create a plan for how to respond to that." Beck violated the CDL requirement of reducing his speed to go with the flow of traffic approximately one mile ahead of the curve by moving to the fast lane to avoid needing to slow down after encountering slower traffic in the right lane, and by never disengaging his cruise control set at 70 mph.

37

As to curves, the CDL manual requires truck drivers to "slow down to a safe speed and downshift to the right gear before entering [a] curve . . . [because] [e]xceeding the posted speed limit on a curve in a truck is extremely dangerous." The CDL manual also requires truck drivers to drive advisory speed limits. In this case, the advisory speed limit for the curve at issue was 60 mph ("the mandatory CDL curve speed limit"). Plaintiffs' accident reconstructionist expert testified to a reasonable degree of engineering certainty that had Beck been driving the mandatory CDL curve speed limit of 60 mph into the curve, Beck's truck would have stopped 10.36 feet short of Mother's vehicle and the collision would not have occurred. In this case, however, Beck kept his cruise control set at 70 mph and exceeded the mandatory CDL curve speed limit by 9-10 mph as he drove into the curve, thereby violating this CDL requirement.[26]

Finally, as to visibility, the CDL manual requires truck drivers to maintain visibility for 12-15 seconds of traveling distance, which is about 1/4 of a mile at highway speeds on a straight road. A truck driver must drive at a speed that allows him to stop within the distance the driver can see, and if that length of vision is not available, the driver must slow down because he cannot keep a careful lookout. Beck violated the visibility requirement by keeping his cruise control set at 70 mph when driving into the blind curve instead of slowing down.

Importantly, Plaintiffs' trucking safety expert testified at trial that based on the preserved data from Beck's tractor-trailer truck on the date of the accident, it was his opinion to a "reasonable degree of trucking safety certainty" that Beck failed to use the highest degree of care that a professional driver of an 18-wheeler would use under the same or similar circumstances. Plaintiffs' trucking safety expert also testified to a "reasonable degree of scientific certainty" that Beck's "incredible deviation from the standard of care" was a direct and contributing cause of the collision with Mother's vehicle.

---

[26] Beck also exceeded the posted regular speed limit of 65 mph by 4-5 mph.

38

### iii.-iv.  Evidence of the Creation of a High Probability of Injury and Beck's Conscious Disregard of the Safety of Others

A reasonable juror could have also found from the evidence in this case that Beck's intentional violations of the four separate CDL requirements discussed above created a high probability of injury and that Beck consciously disregarded the safety of others by speeding into the curve he knew he would be "driving [] blind" through.  The evidence showed: (1) Missouri's CDL requirements provide safety standards designed to prevent heavy tractor-trailer trucks from causing fatal crashes; and (2) because Beck knowingly violated the requirements by keeping his cruise control set at 70 mph going into the curve, Beck's 50,000-pound tractor-trailer truck collided with Mother's vehicle at 34 mph, a speed at which the force of impact was equivalent to that of an SUV traveling at 221 mph.

Moreover, because of Beck's history of driving the same route for six months prior to the fatal accident in this case and because Beck had traveled through the curve approximately fifty times, Beck was aware of the curve and knew that if there was ever a problem on it, he could only avoid an accident by lessening his speed and the distance it would take him to come to a stop.  Beck also knew he could not see around the curve at issue, and that he would be "driving [] blind" if he drove too fast to stop within the distance he could see ahead of him.  Although Beck admitted these circumstances were reasons for a truck driver to slow down when driving into the curve, on the date of the accident in this case Beck did not slow down.  Instead, with the cruise control still set at 70 mph, Beck's tractor-trailer truck actually accelerated into the curve.

Furthermore, Beck admitted he did not comply with all of the requirements of the CDL manual during the timeframe leading up to the fatal accident even though: (1) he had been a CDL driver for seventeen years prior to the accident; (2) he knew an 18-wheeler, weighing 50,000 pounds, could do a lot more damage than a car traveling at the same speed; and (3) he knew someone could die if he did not follow the requirements of the CDL manual.

39

####### c.       Conclusion as to Defendant Beck

In sum, similar to the Court's holding in *First National Bank*, it was a matter for the jury

to decide whether an ordinary careful and prudent driver of a fully loaded 18-wheeler would not

have violated the CDL manual requirements and whether the violations of the requirements

amounted to a reckless indifference to the rights of others and presented a high probability of

injury. *See* 865 S.W.2d at 729-30. In other words, Plaintiffs made a submissible claim for

aggravating circumstances damages against Defendant Beck, and the trial court did not err in

submitting the claim to the jury. *See id.*; *Coon*, 207 S.W.3d at 637-39 (similarly holding with

respect to a defendant's known violation of CDL manual requirements); *see also Ingham*, 608

S.W.3d at 715; *Koon*, 539 S.W.3d at 773; *Kelly*, 245 S.W.3d at 849.

**3.       The Trial Court Did Not Err in Submitting a Claim for Aggravating Circumstances Damages Against Defendant Great Plains**

We also hold there was sufficient evidence to support the submission of aggravating

circumstances damages against Defendant Great Plains because there is evidence showing Great

Plains itself engaged in conduct before and after the fatal accident in this case that was

tantamount to intentional wrongdoing.[27] *See Koon*, 539 S.W.3d at 773. An employer-

defendant's conduct before and after an injury supports the submission of aggravating

circumstances damages "if so connected with the particular acts as tending to show the

defendant's disposition, intention, or motive in the commission of the particular acts for which

damages are claimed." *Oyler v. Hy-Vee, Inc.*, 539 S.W.3d 742, 743-44, 750-51 (Mo. App. W.D.

---

[27] A plaintiff may also make a submissible claim for aggravating circumstances damages against an employer under a theory of vicarious liability. *Koon*, 539 S.W.3d at 775. "When an employer concedes vicarious liability for the acts of its employee[,] all that is necessary to award punitive damages against the employer is that the employee's actions meet the level justifying an award of punitive damages." *Id.* (citation and internal quotations omitted). Here, because this Court can find nothing in the record showing Great Plains conceded to vicarious liability for the acts of its employee Beck and because we find Plaintiffs made a submissible claim for aggravating damages against Great Plains based on Great Plains' own conduct, we limit our opinion to discussing the evidence showing Great Plains engaged in conduct itself that was tantamount to intentional wrongdoing. Nevertheless, nothing in this opinion should be construed as finding a plaintiff may make a submissible claim for aggravating circumstances damages against an employer under a theory of vicarious liability only if the employer concedes to such liability.

2017) (quoting *Charles F. Curry & Co. v. Hedrick*, 378 S.W.2d 522, 536 (Mo. 1964)). There are multiple instances of Defendant Great Plains' conduct in this case supporting a finding that Plaintiffs' claim for aggravating circumstances damages against Great Plains was submissible.

We first turn to *Coon*, where the Western District held that when a defendant-employer is aware of regulations and industry standards governing safety, including CDL manual requirements, but the employer has a policy of giving employees discretion in whether to follow the requirements, such evidence demonstrates the employer showed a complete indifference or conscious disregard for the safety of others. 207 S.W.3d at 636-39. Notably, in this case, Defendant Great Plains did not *just* have a policy giving its drivers discretion in whether to follow the CDL manual requirements as the defendant-employer did in *Coon*; instead, and as admitted by Great Plains' president, Great Plains had an unwritten policy providing professional truck drivers should go 4-5 mph over the speed limit "[i]n all circumstances," and "[e]ven in a fatal collision." A reasonable juror could have found this policy actively directed and encouraged professional truck drivers to violate CDL manual requirements providing drivers must slow their speed when certain conditions are met. *See id*. A reasonable juror could have also inferred from Great Plains' policy that Great Plains placed its ability to make a profit by prioritizing speed and time above the well-being and safety of the public who were drivers and passengers on the same roads as Great Plains' tractor-trailer drivers. *See Blanks v. Fluor Corp.*, 450 S.W.3d 308, 404 (Mo. App. E.D. 2014) (similarly finding); *see also Coon*, 207 S.W.3d at 638-39. Accordingly, the evidence and inferences therefrom support a finding that Great Plains showed a complete indifference or conscious disregard for the safety of others by having a policy providing professional truck drivers should go 4-5 mph over the speed limit "[i]n all circumstances." *See Blanks*, 450 S.W.3d at 402-04; *Coon*, 207 S.W.3d at 636-39.

41

Additionally, Great Plains failed to investigate, discuss, or meaningfully acknowledge safety issues with the underlying tortfeasor Beck after the fatal crash which resulted in Decedent's death. Specifically, Great Plains did not review whether Defendant Beck had complied with the requirements of the CDL manual, and Great Plains did not tell Beck to lower his speed when driving on a curve or wet road in the future. Upon questioning by Plaintiffs' counsel at trial, Great Plains' safety director and Great Plains' president each admitted Beck did not comply with all of the requirements of the CDL manual during the timeframe leading up to the fatal accident. Nevertheless, Great Plains' safety director testified she believed Beck drove at a "safe" and "reasonable" speed during the timeframe leading up to the accident and that she would not (and did not) recommend Beck do anything differently than he did. Moreover, Great Plains' president testified, "I'd probably have done the same thing [as Beck] if I was there [on the date of the accident in this case]." The failure of Defendant Great Plains to investigate, discuss, or meaningfully acknowledge safety issues with Defendant Beck, who was the underlying tortfeasor in this case, "evidences a complete indifference to and conscious disregard for the safety of others." *See Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67, 77 (Mo. App. E.D. 1988) (similarly holding); *see also Kelly*, 245 S.W.3d at 850.

There was also evidence Great Plains failed to take any corrective action following Decedent's death, which further supports the conclusion that its conduct exhibited complete indifference or a conscious disregard for Decedent's safety. *See Oyler*, 539 S.W.3d at 750-51 (similarly holding). Great Plains did not require Beck to have any additional training after the fatal accident, and Great Plains failed to institute any remedial measures after the fatal accident. Furthermore, a reasonable juror could have found a number of specific remedial measures would prevent a repetition of the events leading to Decedent's death. *See id.* Most notably, Great Plains could have eliminated its unwritten rule for its tractor-trailer driver employees to go 4-5

42

mph over the speed limit "in all circumstances." Or, as an additional example, Great Plains could have instituted consistent written and unwritten policies encouraging its employees to follow all CDL regulations. A reasonable juror could have found Great Plains' failure to institute remedial measures suggested by the evidence exhibited its complete indifference to and conscious disregard for the serious risk of injury to the public who, like Mother and Decedent, were drivers and passengers on the same roads as Great Plains' tractor-trailer drivers. *See id*.

In sum, a reasonable juror could have found Defendant Great Plains' conduct before and after Decedent's death was tantamount to intentional wrongdoing, and Plaintiffs demonstrated by clear and convincing evidence that Great Plains showed a complete indifference to or a conscious disregard for the safety of others. *See Ingham*, 608 S.W.3d at 714; *Koon*, 539 S.W.3d at 773. In other words, the evidence and the inferences drawn therefrom were sufficient to permit a reasonable juror to have concluded that Plaintiffs established with convincing clarity that "[D]efendant [Great Plains] knew or had information from which [it], in the exercise of ordinary care, should have known that the alleged negligent conduct created a high degree of probability of injury, and thereby showed complete indifference or conscious disregard for the safety of others." *See Coon*, 207 S.W.3d at 637; *see also Ingham*, 608 S.W.3d at 715; *Koon*, 539 S.W.3d at 773; *Kelly*, 245 S.W.3d at 849. Therefore, Plaintiffs made a submissible claim for aggravating circumstances damages against Defendant Great Plains. *See id*.

**4.      Conclusion as to Defendants' Fourth Point on Appeal**

Based on the foregoing, the trial court did not err in submitting claims for aggravating circumstances damages against Defendant Beck and Defendant Great Plains. Defendants' fourth point on appeal is denied.

## III. CONCLUSION

The trial court's judgment entered upon the jury's verdicts awarding Plaintiffs $10 million in compensatory damages against Defendants, $10 million in aggravating circumstances damages against Great Plains, $25,000 in aggravating circumstances damages against Beck, and post-judgment interest against Defendants is affirmed.

_____
ROBERT M. CLAYTON III, Presiding Judge

Philip M. Hess, J., concurs,
Cristian M. Stevens, J., dissents in a separate opinion.



# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

CARRIE S. SCHULTZ and ROBERT C. ) No. ED111241
SCHULTZ, SR., surviving parents of )
ROBERT C. SCHULTZ, JR., deceased, )
)
    Respondents, ) Appeal from the Circuit Court
) of St. Charles County
v. ) Cause No. 2011-CC00821
)
GREAT PLAINS TRUCKING, INC., and ) Honorable W. Christopher McDonough
LENNIS H. BECK, )
)
    Appellants. ) Filed: March 26, 2024

## DISSENT

I respectfully dissent from the majority opinion affirming the judgment of the trial court.

A jury tasked with determining liability and causation of a catastrophic traffic collision heard no

evidence of the chronic marijuana use of Plaintiff Carrie Schultz, including the undisputed

evidence that Schultz smoked marijuana two or three times every day and took two hits of

marijuana resin less than one hour before driving her son in her car and losing control of the car

on Interstate 70.

This is highly relevant evidence in this case and sets an important precedent, considering

that recreational marijuana use is now a constitutional right in Missouri, *see* Mo. Const. art. XIV,

§ 2 (2022),[1] and, according to Doctor's testimony and the Bergamaschi paper, alcohol and marijuana are the top two causes of impaired driving in automobile accidents.

I agree with the majority that the trial court properly excluded evidence of Schultz's blood THC levels. Given the current state of the law and scientific research, Doctor was left with no statutorily recognized or scientifically accepted standard against which to compare Schultz's blood THC levels to determine whether she was impaired, rendering that evidence unreliable and irrelevant for all the reasons the majority explains.[2] Pursuant to Section 490.065 and the body of Missouri case law cited at great length by the majority, scientifically unreliable or irrelevant expert opinions are, and always should be, excluded. *See*, *e.g., Huett v. Branson*, 675 S.W.3d 514, 521, 525 (Mo. App. E.D. 2023).

But Doctor also opined that chronic marijuana users, regardless of blood THC levels, remain impaired even when they abstain for weeks from marijuana use, let alone when they do not. Schultz was an admitted chronic, that is, daily, marijuana user who smoked two hits of marijuana resin, or residue of the marijuana leaf, less than one hour before losing control of her car, colliding with the highway median and another vehicle, and coming to a complete stop in the passing lane of Interstate 70, causing the crash at issue here.

Doctor is the Chief Medical Examiner of St. Louis, St. Charles, Jefferson, and Franklin Counties, and has been for more than 30 years. She is the Chief Medical Examiner for the Regional Medical Examiner System. Doctor was the Co-Director of the Division of Forensic Pathology and is a Professor *Emerita* of Pathology at the St. Louis University Health Sciences

---

[1] Article XIV, Section 2 nonetheless expressly disclaims, "This section is not intended to allow for . . . driving while under the influence of marijuana . . .." *Id.* § 2.1.

[2] The Legislature could resolve this problem by setting a statutory legal limit for blood THC levels, as it has with blood alcohol levels in Section 577.012.1.

Center. She taught neuropathology and forensic pathology at the St. Louis University School of Medicine and the University of Missouri School of Medicine. She has been board certified in neuropathology since 1975 and has been a consultant in neuropathology at several prominent hospitals in the St. Louis area. In her roles as medical examiner and expert witness, Doctor has determined, and rendered opinions regarding, whether a person is impaired by drugs.

In March 2022, nearly five months before trial, Defendants disclosed their experts, including Doctor. According to the disclosure, Doctor's testimony would include "Carrie Schultz's toxicology report, intoxication, and impairment at the time of the subject accident, as well as the effects of such on her driving."

During Doctor's May 2022 deposition, Schultz's lawyers cross-examined her with the Bergamaschi paper, "Impact of Prolonged Cannabinoid Excretion in Chronic Daily Cannabis Smokers' Blood on Per Se Drugged Driving Laws," with which Doctor was not previously familiar. Schultz's lawyers propounded the Bergamaschi paper for its conclusion that the presence of THC in blood samples of chronic marijuana users may not indicate acute, or recent, marijuana use because THC remains present in chronic marijuana users even when they abstain from marijuana use. On appeal, Plaintiffs continue to cite the Bergamaschi paper in their table of authorities and extoll the paper's "scientific conclusions" for nearly a full page of their brief.

Doctor sat for a second deposition in July 2022 as an offer of proof of testimony Defendants would have presented at trial regarding Schultz's marijuana use and its impairment of her psychomotor performance.[3] Doctor reiterated her opinion that Schultz's acute blood THC levels rendered her impaired.

---

[3] Plaintiffs do not argue on appeal that Doctor's opinions were late disclosed or untimely.

Doctor also testified that, after Plaintiffs' lawyers presented her with the Bergamaschi paper at the May deposition, she more closely reviewed that study. The Bergamaschi paper was co-authored by Marilyn Huestis, a recognized authority on marijuana with whom Doctor is familiar. Huestis also is the author of the chapter on marijuana in the 2014 textbook "The Principles of Forensic Toxicology," which Doctor commonly references.

In the Bergamaschi/Huestis study, the researchers put chronic daily marijuana smokers into 33-day abstinence in a controlled environment and tested their daily blood THC levels. The maximum amount of blood THC levels was 2.9 nanograms per milliliter, lower than Schultz's blood THC levels of 3.5 nanograms per milliliter a few hours after she lost control of her car. The blood THC levels of the chronic marijuana users in the Bergamaschi/Huestis study decreased over time. By the end of the study, their blood THC levels fell below the minimum quantitation, meaning they no longer registered in a blood THC test. More importantly for our purposes here, the Bergamaschi/Huestis paper also referenced similar studies reporting persisting neurocognitive impairment in chronic marijuana users even after prolonged abstinence.

Doctor conducted additional research regarding chronic marijuana use and its effects on users. That additional research included reviewing a follow-up paper to the Bergamaschi/Huestis paper studying psychomotor function in the same abstinent group of chronic marijuana users. That paper, "Psychomotor Function in Chronic Daily Cannabis Smokers During Sustained Abstinence" ("the Huestis paper"), also was authored by Marilyn Huestis with various co-authors.

The Huestis paper explains that, though blood THC levels in chronic marijuana users decreased over time during abstinence in the Bergamaschi/Huestis study, the neurocognitive abilities and psychomotor performance of chronic marijuana users remained impaired for weeks

4

after abstention. That impairment includes prolonged reaction time and divided attention, the two most harmful impairments of marijuana on driving. Prolonged reaction time means, for example, taking longer to brake or steer to avoid dangerous conditions. Divided attention decreases "critical tracking," which testing shows causes "standard deviation from lateral position," meaning a driver drifts out of her lane of travel to one side or the other. The Huestis paper demonstrates that chronic marijuana users, even in abstinence, continue to have impaired psychomotor performance as measured by critical tracking and divided attention.

Similarly, according to settled principles and methods in "The Principles of Forensic Pathology" textbook, also authored by Marilyn Huestis, THC still affects the brains of chronic marijuana users even when it can no longer be detected in their blood, meaning chronic users "may never be unimpaired."

Based on her additional research regarding the Bergamaschi/Huestis paper, the follow-up Huestis paper studying the psychomotor function of chronic marijuana users, and "The Principles of Forensic Toxicology" textbook, Doctor opined that Schultz, a chronic marijuana user, who smoked marijuana two to three times every day and twice within one hour of losing control of her car, was impaired due to her chronic marijuana use.[4]

Based on her review of the evidence, including Schultz's deposition and written statement, dash cam video of the collision, the police report, and other witness statements, Doctor opined, "The behavior of [Schultz's] vehicle is consistent with someone that is impaired

---

[4] Whether the marijuana resin smoked by Schultz on the morning of the crash contained THC, and therefore whether Schultz remained a chronic marijuana user as of that morning or only as of every previous day on which she admittedly smoked marijuana, or, put another way, whether Schultz had "abstained" from marijuana use for only one hour or one day before the crash, is immaterial to the admissibility of Doctor's opinion that chronic marijuana users remain impaired after weeks of abstinence. In any event, a jury reasonably could draw the inference that chronic marijuana users smoke marijuana resin for a reason.

and that went out of their lane of travel and tried to control it and began fishtailing and then striking the median, and so on, into the rest of the accident." Doctor concluded by a reasonable degree of scientific certainty that Schultz's impairment from marijuana use led to her loss of control of her car.

Doctor made clear her opinion that Schultz's chronic marijuana use, separate and apart from her acute marijuana use and blood THC levels on the day of the crash, impaired Schultz: "If she did not have acute use, she could also be impaired because she's a chronic user. This group of chronic cannabis users, when placed in abstinence and tested on critical tracking and divided attention task, they were found to be significantly impaired at the end of the three-week period of abstinence."

As intended, Doctor's entire July deposition was submitted as an offer of proof. In pleadings in support of the offer of proof and at the pre-trial hearing, Defendants pointed to Doctor's testimony that "*even if* one were to assume that the THC present in Carrie Schultz's blood was residual from prior use, studies show that chronic cannabis users had impaired psychomotor performance even during a period of abstinence." The trial court rejected the entire offer of proof and excluded "any opinion testimony on Carrie Schultz's THC impairment or causation in this case."

As I have said, the learned trial court did not abuse its discretion in excluding Doctor's opinion regarding blood THC levels under existing case law. But the jury should have heard Doctor's opinion regarding Schultz's chronic marijuana use, and resulting impairment and loss of control of her car. *See generally Huett*, 675 S.W.3d at 521-23, 523-25 (holding not error to admit expert's general causation testimony; abuse of discretion to admit expert's specific causation testimony); *Revis v. Bassman*, 604 S.W.3d 644, 650, 652-54, (Mo. App. E.D. 2020)

(holding abuse of discretion to prohibit cross-examination of expert's bias; not error to admit expert's causation testimony).

Pursuant to Section 490.065, Doctor's testimony was based on sufficient facts or data and was the product of reliable principles and methods, and Doctor reliably applied those principles and methods to the facts of the case. *See* RSMo § 490.065.2(1)(b), (c), (d). In fact, the facts and data, and reliable principles and methods on which Doctor's testimony was based are found in the Bergamaschi/Huestis paper espoused by Plaintiffs before trial and on appeal, a follow-up paper also co-authored by Marilyn Huestis, and a forensics textbook chapter authored by Huestis. Because the testimony was scientifically reliable under Section 490.065, it also was highly relevant to the issues of Schultz's impairment and causation in this case.

The majority finds the Western District's *Secrist* decision instructive, but that case dealt with evidence of blood THC levels, evidence we all agree properly was excluded here. *See* 356 S.W.3d 276 (Mo. App. W.D. 2011). *Secrist*, a 2011 case, has no application to the principles and methods on which Doctor based her opinion that Schultz, a chronic marijuana user who had not abstained even as recently as one hour before the collision, was impaired. Even if *Secrist* could be stretched to apply here, the *Secrist* factors are patently inapplicable to Doctor's opinion regarding the effects of chronic marijuana use and are merely one way of determining whether expert opinions regarding blood THC levels are relevant, but certainly not the only way of determining reliability and relevance under Section 490.065.[5]

Defendants' defense was that the direct and proximate cause of Plaintiffs' injuries was Schultz's own negligence in being under the influence of marijuana and losing control of her

---

[5] The holding in *Secrist* and the *Secrist* three-part test rested on that court's dismissing what it characterized as "popular stereotypes" regarding drug use. 356 S.W.3d at 283. The subsequent research upon which Doctor relies tends to prove the contrary.

7

vehicle. There is a reasonable probability that the jury would have assessed the case differently if presented with evidence of Schultz's chronic marijuana use as late as within one hour before driving her son in her car and losing control of the car, resulting in the horrendous crash at issue here. *See Secrist*, 356 S.W.3d at 284 ("There is no question that there is a reasonable probability that this error prejudiced Appellants . . ." where evidence of appellant's blood THC levels erroneously was admitted into evidence and jury found appellant 80 percent at fault for falling down elevator shaft). This error materially affected the merits of the case, and Defendants were prejudiced. *See Linton by and through Linton v. Carter*, 634 S.W.3d 623, 627 (Mo. banc 2021); *Huett*, 675 S.W.3d at 525; *Secrist*, 356 S.W.3d at 284.

I respectfully dissent. Because I would reverse and remand for a new trial on Point I, I do not reach Defendants' other points on appeal.

_____
Cristian M. Stevens, Judge

8